JOHN J. CADIGAN *vs.* LOTTA M. CRABTREE.

Suffolk.    January 10, 1901. — September 5, 1901.

Present: HOLMES, C. J., KNOWLTON, MORTON, BARKER, & LORING, JJ.

*Agency,* Broker's commission.

Where the owner of real estate employs a broker to bring him an offer for the pur-
chase of it without naming a price, there can be no implied agreement that the
broker is entitled to a reasonable time in which to procure an acceptable offer,
and the owner has a right to dismiss the broker at any time.

A real estate broker who has not been successful in procuring a customer for his
principal is never entitled to recover on a *quantum meruit* for work done.  If his
work was in fact the efficient and predominating cause of a sale concluded by
another, or if the principal is unable or refuses to sell to a customer furnished
by the broker in accordance with the terms of the offer, the broker is entitled to
his commission; otherwise, to nothing at all.

In an action by a real estate broker to recover a commission, it appeared, that the
plaintiff was employed by the defendant, to procure a lessee for a certain hotel,
and knowing the terms then acceptable to the defendant the plaintiff conducted
negotiations with G. and P. on the matter, satisfying himself that they were will-
ing to comply with the defendant's terms but getting no offer from them.  The
defendant then changed his mind and said he had decided not to let the
hotel.  Thereupon the plaintiff told the defendant that G. and P. were ready to
take the hotel on the terms hitherto asked.  Later the defendant dismissed the
plaintiff and employed another broker who let the hotel to G. and P. substan-
tially on the terms previously named.  The jury were instructed, that if at the
time the defendant changed his mind the plaintiff had gone so far in his nego-
tiations with G. and P. that they had agreed to take a lease of the hotel on the
terms named, and the defendant on being told of this had declined to let the
hotel and afterwards had made substantially the same trade with G. and P.
through another broker, the plaintiff could recover his commission.  *Held,* that,
if there had been any evidence to go to the jury that G. and P. had agreed to
take a lease of the hotel on the terms named, there would have been no error in
these instructions, but, there being no such evidence, an exception to the instruc-
tions was sustained.  On the evidence, all that the jury would have been war-
ranted in finding was that G. and P. were believed by the plaintiff to be ready to
take the hotel on the terms named but that they never made an offer to that
effect.  *Whether* the plaintiff under different instructions could have recovered
a commission without proving that G. and P. made an offer to take the hotel
on the terms named, the court did not decide.

CONTRACT to recover a commission for services as a real
estate broker, in negotiating a lease of certain property of the
defendant in Boston known as the Hotel Reynolds, and in pro-
curing purchasers for that property and an adjacent property

known as the Park Theatre, to whom the defendant refused to sell when offered the price agreed upon.   Writ in the Supreme Judicial Court dated July 29, 1899.

The declaration as amended contained six counts.   The first count alleged that the plaintiff procured a customer to purchase from the defendant the Hotel Reynolds and the Park Theatre for an agreed price of $800,000, but that the defendant refused to carry out the terms of the sale or to convey the property, and that the plaintiff thereby earned a commission of $8,000.   The second count was for the same cause of action stated in an account annexed.   The third count alleged that the defendant employed the plaintiff to procure a tenant for the property in question, and that the plaintiff at once undertook negotiations in her behalf for the leasing of the property, and that on or about January 1, 1899, he procured a tenant for the property at an agreed rental, but that the defendant wholly neglected and refused to carry out the agreement, and thereafter made a lease of the property to the same person through another real estate broker; and that the plaintiff thereby earned his commission upon the leasing of the property, which amounted to $2,750. The fourth count was upon an account annexed, for $2,750 as a commission upon the lease of the property, and for interest thereon from January 1, 1898, to the date of the writ.   The fifth count alleged that on or about October 1, 1898, the defendant employed the plaintiff to negotiate for her a sale of the properties known as the Park Theatre and the Hotel Reynolds; that the defendant gave to the plaintiff the exclusive right to negotiate the sale of those properties, it being thereby impliedly agreed and understood as a condition of the employment that the properties should be sold at a reasonable price and should remain in his hands as broker, exclusively, for a reasonable time, in order to enable the plaintiff to negotiate and effect a sale thereof; that thereafter the plaintiff expended a large amount of time and money in advertising and in obtaining customers therefor; that while the plaintiff was negotiating with customers for the purchase of the property at the price of $815,-000, the sale price at which it was placed in the plaintiff's hands, and before the plaintiff had a reasonable opportunity to effect and carry out the sale at that price, the defendant noti-

fied the plaintiff that she would not sell the property at that price, and thereupon established a new price of $1,100,000 for the sale of the property, and notified the plaintiff thereof. Whereby, by the defendant's refusal to carry out the terms of her agreement with the plaintiff, the plaintiff was unable to effect and completely carry out the sale which he was negotiating. That thereafter the plaintiff's exclusive services as broker were continued in an attempt to sell the property at the price of $1,100,000; that thereafter, the defendant being made to understand that the price of $1,100,000 was ridiculously excessive, again continued the exclusive services of the plaintiff as broker in an attempt to accomplish a sale of the property at $850,000 net; that while the plaintiff was negotiating the sale of the property to various parties, and before he had had a reasonable time to effect and complete a sale of the same at the price of $850,000 net, the defendant, entirely without excuse, and in violation of her contract of employment with the plaintiff, notified the plaintiff that she thereby withdrew the property from the hands of the plaintiff, and placed it in the hands of another broker. Whereby the negotiations of the plaintiff with various customers being interrupted, and the sale being prevented by the actions of the defendant, in violation of her agreement of employment with the plaintiff as a broker, the plaintiff became entitled to the sum of $8,000 as compensation for his services as broker, rendered at the request of the defendant, the money paid by him for advertising already having been repaid to him by the defendant. The sixth count was on an account annexed for $8,000 for services rendered under a contract of employment as broker for the sale of the Park Theatre and the Hotel Reynolds.

At the trial before *Morton*, J., the first and second counts were stricken out with the consent of the plaintiff's counsel. The justice against the exception of the plaintiff ordered a verdict for the defendant on the fifth and sixth counts, and against the exception of the defendant submitted the case to the jury on the third and fourth counts.

The jury returned a general verdict for the plaintiff in the sum of $2,847.38. Both the plaintiff and the defendant alleged exceptions.

The evidence is sufficiently stated in the opinion of the court except upon the defendant's exception, sustained by the court, to the refusal of the justice to direct a verdict for the defendant on the fourth count. The following extract from the cross-examination of the plaintiff is material under this exception upon the question, whether there was any evidence that, at the time the defendant had changed her mind and refused to let the Hotel Reynolds, the plaintiff had received from Gould and Pollo or communicated to the defendant an offer made by them to take the Hotel Reynolds on the terms of the Mann lease:

" *Q.* Did you ever get any offer from Gould and Pollo for that property [the Hotel Reynolds] ? *A.* No, because I gave them the terms at that time, the same terms given to Mann, and just at that time Miss Crabtree said she would not do anything about the property. — *Q.* Then I understand you never got from them any offer of what they would give? *A.* No. They always talked about hiring it on the same plan that Mann was to hire it on. — *Q.* And did you ever communicate to Miss Crabtree or to Mr. Gilman [the defendant's agent] any offer of Gould and Pollo, — did you ever communicate any offer of theirs? *A.* No, sir. —*Q.* You never had any to communicate, did you? *A.* No, sir, there was n't any offer to be made. — *Q.* Do you remember this: do you remember that Mr. Gould told you that he might give $25,000 a year for the property if the owner would spend $30,000 in repairs? *A.* Yes, sir. — *Q.* And you remember he said, ' You understand that is not an offer'? *A.* Yes, sir. — *Q.* When did he make that suggestion to you ? *A.* I think that was in December; I am not sure about it now. — *Q.* That is the only suggestion of an offer ever made by Gould and Pollo, was it not ? *A.* That was not an offer. — *Q.* Did you ever state or communicate to Miss Crabtree that Mr. Gould might give $25,000 a year, if she would spend $30,000 ? *A.* No, I never made that proposition. — *Q.* Did you ever make that proposition in any form to Miss Crabtree or to Mr. Gilman? *A.* Yes, sir. I called on January 2, 1899, at five o'clock, and saw Miss Crabtree at the Adams House; she said she was going away and would do nothing about letting the Reynolds until she came back. I told her Mr. Gould would like to hire it, and also Mr. Kraft. That is a memorandum I

made shortly after coming back from the Adams House. — Q. What is the memorandum? A. That is in my diary in the office. — Q. You mean you copied this from your diary? A. Yes, sir. — Q. There is nothing there telling Miss Crabtree what they would give? A. There was no question of what they would give; they would have to take it at her terms or not get it. — Q. That is what I ask you, if you made any suggestions? A. They were ready to take it on the terms. — Q. I ask you if you gave her any idea at that interview of what they would give? A. No. They were ready to hire the hotel on the terms already talked about. That is the way I understood it. — Q. Did you ever tell her, or tell Mr. Gilman, — name any figure that Gould and Pollo said they might give? A. No, except that they would like to hire the hotel."

The plaintiff further testified, on cross-examination, that on November 23, 1898, he wrote a letter to Mr. Gilman, stating that he had a tenant for the Hotel Reynolds who would pay $25,000 a year rent, the owner to make repairs and any necessary alterations. [It had appeared by other evidence that this offer had been refused by the defendant.] The plaintiff then testified as follows: "The party that I was speaking of in that letter, and whom I did not name, was Mr. Gould. — Q. And that is the only proposition that you made to Miss Crabtree, and it is only through her attorney, as to what Mr. Gould might do, is it not? A. That is the only direct proposition."

Later the plaintiff testified, as follows: "A. He [Gould] always intimated to me that he would hire it if he could get it, when she decided to rent it. — Q. You were going in there from time to time to get your supper, and he would ask you if there was anything new? A. Yes. — Q. And you did not try to do anything about leasing that property to Gould and Pollo after the first of January, no more than to go in and get your supper, and ask if there was anything new? A. Nothing. They were ready to hire when Miss Crabtree was ready to let it, and I kept writing her to know if she would let it."

On re-direct examination, the plaintiff testified: "I never submitted any offer other than that of $25,000 a year to Miss Crabtree or Mr. Gilman. The proposition of Mr. Mann was substantially that of the terms stated in the lease to Gould

and Pollo. I told Gould and Pollo that those were the terms, $25,000 for the first five years and $30,000 for the second five years, and the lessor to spend $35,000 in alterations and repairs, and to get six per cent interest on the $35,000. After the Mann lease fell through I saw Gould and Pollo that same night. They started right in to look up the details of lease. I told them the terms of the Mann lease. On January 2, I told Miss Crabtree at the Adams House that I had Gould and Pollo and also Mr. Kraft who would like to hire the hotel. She said she was tired and was going away, and would not take the matter up until she came back. I told her they were ready to hire on the same terms as the Mann lease."

*S. L. Whipple*, for the plaintiff.

*F. Paul*, for the defendant.

LORING, J. 1. The presiding justice was right in directing a verdict for the defendant on the fifth and sixth counts.

There was no evidence which would have warranted a verdict for the plaintiff. The most that could have been found in favor of the plaintiff was that the defendant employed him as a broker, in September, 1898, to find for her a purchaser for the Hotel Reynolds and that it was then stated that he was the only broker in the matter. The plaintiff's employment in the matter was brought about by one Gilman, the agent in Boston of the defendant, who did not live in that city. The plaintiff testified that Gilman "said that he thought that Miss Crabtree, from his conversation with her, would sell the property for $800,000. Under a suggestion that I ask $815,000, I started out." The plaintiff got several offers; one for $750,000 in cash, and another for $750,000, part in cash and part in "other property in trade." These offers were reported to the defendant personally between November 7 and November 11 of the same year, and were refused. The defendant then fixed her price at $1,100,000, which the plaintiff testified "practically stopped the negotiations." On February 25, 1899, the defendant notified the plaintiff that she was willing to take $850,000 for the property; but on March 1 following she revoked the plaintiff's authority to sell the estate at all, and notified him that she had put the property in the hands of another broker for sale, to the exclusion of the plaintiff and every one else.

No sale of the property has been made. It appears that the defendant has paid the plaintiff the amount he was out of pocket in the matter.

The plaintiff's contention is that he is entitled to recover damages from the defendant for preventing him from earning a commission by finding a person who would buy the estate, and on the ground that he was entitled to a reasonable time in which to find a customer and his authority to do so was revoked before that time had passed.

Until February 25, when the defendant put a price upon the property, it is plain that the defendant could revoke the plaintiff's employment without coming under any liability to the plaintiff for so doing. We take February 25, as the date when a price was put upon the property because the plaintiff's contention was that the price of $1,100,000 put upon the property in the early part of November could not seriously be regarded as a price that could be obtained for the property. Where the owner of property employs a broker to bring him an offer for the purchase of it, without naming a price at which he is willing to sell, — that is to say, where the owner of property employs a broker to bring him an offer which he is to pass upon after it is brought to him, — there can be no implied agreement or understanding that the broker is to be entitled to a reasonable time in which to procure such an offer; in such a case, the owner has a right to reject every offer brought to him, as was held in *Walker* v. *Tirrell*, 101 Mass. 257; and it is plain that under those circumstances he could decide not to accept any offer and to dismiss the broker altogether. But the right of an owner to put an end to the broker's employment is based on a consideration which goes deeper than that, and includes the case where a price is named by the owner at which he is willing to sell his property. That consideration is the nature of a brokerage commission; the very essence of a brokerage commission is that it is dependent upon success and that it is in no way dependent upon, or affected by, the amount of work done by the broker. A brokerage commission is earned if the broker, without devoting much, or any, time to hunting up a customer, succeeds in procuring one; and it is equally true, on the other hand, not only that no commission is earned if a broker is not successful, but a

broker is not entitled to any compensation, no matter how much time he has devoted to finding a customer, provided a customer is not found. See in this connection *Sibbald* v. *Bethlehem Iron Co.*, 83 N. Y. 376, 383. The promise to pay a brokerage commission if a customer is found to purchase at a stated price is not the ordinary employment of labor, but is more in the nature of an offer, namely, an offer to pay a commission if a person is produced who buys at the price named; and, like any other offer, it can be withdrawn at any time, without regard to the fact that work has been done by a person in reliance on it, provided the work done has not brought the person within the terms of the offer. A broker who has not been successful in procuring a customer for his principal is never entitled to recover on a *quantum meruit* for work done. Where a broker has done work, but another broker has closed the trade, it was held that under the peculiar circumstances of *Dowling* v. *Morrill*, 165 Mass. 491, not that he could recover on a *quantum meruit* for work done, but that a commission was earned if his work was in fact the efficient and predominating cause of the sale; and so, where a customer is found to purchase property but the trade is not made or is not carried through because the broker's principal is not able, or does not choose, to convey the property for which he employed the broker to find a purchaser, it is now settled that the broker's remedy is to sue his principal for a commission, and that in such an action he can recover his commission; see *Fitzpatrick* v. *Gilson*, 176 Mass. 477, and cases there cited; although at one time countenance was given to the proposition that in such a case the remedy of the broker was on a *quantum meruit* for work done. See *Drury* v. *Newman*, 99 Mass. 256, 258; also *Walker* v. *Tirrell*, 101 Mass. 257, 258, citing with approval *Prickett* v. *Badger*, 1 C. B. (N. S.) 296.

2. The defendant's exception to the refusal of the justice to direct a verdict for the defendant upon the fourth count must be sustained.

It appears that on or about November 2, 1898, the plaintiff was asked, as a broker, to find a tenant for the Hotel Reynolds, the property which he had been trying to sell for the defendant in the two previous months of September and October. The hotel was then under lease to one Reynolds, and that lease

apparently ran out on January 1, 1899. In the latter part of November the plaintiff brought the matter to the attention of Gould and Pollo. Gould and Pollo then suggested that they might take a lease at $25,000 a year, the hotel being put in running order at the expense of the lessor. This was rejected by the defendant. Later the plaintiff secured a proposal from one Mann to take a lease of the hotel; this was accepted by the defendant, and a lease was drawn up; this lease, however, fell through on December 20, 1898, for some reason not disclosed. The terms of this lease were $25,000 for the first five years and $30,000 for the next five years, the lessor to lay out $35,000 in repairs and alterations and to receive six per cent interest on that expenditure. On December 22 or 23, a few days after the negotiations for the Mann lease had fallen through, the plaintiff again approached Gould and Pollo on the subject, and they came to his office and saw there some plans of the hotel sent to the plaintiff's office by Mr. Gilman, the defendant's agent, for that purpose. We understand that these plans were plans showing the alterations to be made in the hotel under the Mann lease. Gould and Pollo were then told by the plaintiff what the terms of the Mann lease were. On December 29, acting under instructions from the defendant, the defendant's agent, Gilman, directed the plaintiff to take down his sign, which was then hanging in the window of the hotel, as the defendant had decided to sell the property " if it took a year or even more than a year to do it." On January 2, 1899, the plaintiff called on the defendant at a hotel in Boston where she was then stopping, but " she said she was going away, and would do nothing about letting the Reynolds until she got back." She then left Boston and did not return until after the conclusion of the matters which gave rise to this litigation. On February 8, she wrote the plaintiff that the hotel was " for sale only "; and there was evidence that this was in answer to an inquiry from the plaintiff about letting it. On March 3, the defendant notified the plaintiff, in writing, that she had decided not to sell the hotel, and had placed it in the hands of one Fitzpatrick to be let, and added that he was her " sole agent, and he only has authority to negotiate for me." On March 12, Fitzpatrick took Gould to New York, and in an interview then had between Gould and the defendant a lease

from the defendant to Gould and Pollo was agreed upon. This was a lease for ten years, the lessee paying $25,000 a year for the first five years, and $30,000 a year for the second five years, the lessor putting in the necessary plumbing and doing outside repairs. It appeared that the plumbing cost about $15,000, and that about $75,000 was voluntarily spent by Gould and Pollo, the lessees, in alterations and repairs.

The presiding justice instructed the jury that in order to recover the plaintiff must satisfy them that on January 2, 1899, when the defendant changed her mind and decided not to lease the hotel, the plaintiff had gone so far in his negotiations with Gould and Pollo that they had agreed to take a lease of the hotel on the terms of the Mann lease, and that Miss Crabtree, on being told of that, had elected not to lease the hotel to them and afterwards had made substantially the same trade with them through another broker; but, on the other hand, if, on the second of January, when she notified him (the plaintiff) that she was not going any further with the thing, — if, at that time, negotiations had not reached such a stage as to constitute an agreement on the part of Gould and Pollo to take that property on substantially the same terms on which it was afterwards leased by her through the agency of Fitzpatrick, then the plaintiff has not made out his case, and he was not entitled to recover. In addition to this, the jury were distinctly told that if the plaintiff failed to get Gould and Pollo to take a lease and afterwards Fitzpatrick succeeded in procuring a lease from them, the plaintiff was not entitled to a commission.

We are of opinion that the Mann lease and the Gould and Pollo lease were not so far different one from the other as to prevent the plaintiff from recovering a commission if his services resulted in an offer from Gould and Pollo to take a lease on the terms of the Mann lease; we are also of opinion that, if the jury were satisfied that the plaintiff was the efficient cause of the lease to Gould and Pollo, they were justified in finding that the plaintiff's services brought the mind of the lessees to accept the terms finally agreed upon. Had there been any evidence to go to the jury that Gould and Pollo had agreed to take a lease of the hotel on the terms of the Mann lease prior to January 2, there would have been no error in these instructions;

but we are of opinion that there was no evidence on which the jury were warranted in finding that the negotiations between the plaintiff and Gould and Pollo had gone so far as to result in an agreement on the part of Gould and Pollo to take the hotel on the terms of the Mann lease before January 2.

Before disposing of this matter, we will deal with the rulings set forth in the twelfth and thirteenth requests made by the defendant. In those requests, the defendant asked the court to rule, in substance, that to recover on the third count the plaintiff had to prove that he procured an offer from Gould and Pollo in January to lease the hotel on terms fixed by the defendant, but that the defendant did not avail herself of that offer. This ruling the court refused to give, and instructed the jury that if the plaintiff procured an offer from Gould and Pollo to lease the hotel in January, and the defendant subsequently leased the hotel to them through another broker in March, on substantially the same terms, they might find that the plaintiff was the efficient cause of the lease which was made, and if they so found they might render a verdict for the plaintiff on the third count. This was wrong. The case stated in the third count is a different case from that put in by the plaintiff under the fourth count. The difference between the two cases is that in the first case the plaintiff was entitled to his commission on submitting the offer in January ; in the second case, he was not entitled to a commission until the lease was made in March. The ground of recovery in the first case is that the broker procured a customer on the terms fixed by the defendant; in such a case, he earns a commission even though the defendant neglects to avail herself of the bargain which has been secured by the broker. *Fitzpatrick* v. *Gilson*, 176 Mass. 477. The ground of recovery in the second case is that the offer procured in January did not, of itself, entitle the plaintiff to a commission because the defendant had not then fixed the terms on which she would lease the hotel, and the commission was not earned until the defendant availed herself of the plaintiff's services by closing a trade through another broker in March, on substantially the terms of the January offer. The issues in the two cases are quite different. The presiding justice ruled that the plaintiff was not entitled to recover on either count unless he proved

that he was the efficient cause of the lease which was made in March.  This was, in effect, a ruling that the plaintiff had not made out the case set forth in his third count.

We are of opinion that under the defendant's general request that there was no evidence to go to the jury on the fourth count, it is open to her to contend that even if it was not necessary for the plaintiff, in order to maintain the action set forth in that count, to prove that Gould and Pollo made an offer to take the hotel on the terms of the Mann lease (upon which we express no opinion), yet, inasmuch as the presiding justice ruled that unless the plaintiff proved that such an offer had been made he had not made out his case, if there was no evidence that such an offer had been made, the defendant is entitled to have her general exception sustained.

On a fair construction of the testimony set forth in the bill of exceptions, the jury were not warranted in finding that such an offer had been made.  On the direct examination, the plaintiff testified that " Mr. Gould was very anxious at the time to hire the hotel."  When asked by his own attorney as to what was said at that time, he testified : " They were ready to talk and do business ; they came down and looked the plans over." The defendant's attorney at that point interrupted the plaintiff's examination with the question, " What did they say ? " and the plaintiff answered, " They were ready to take the hotel, from what they talked with me.  I told Miss Crabtree that I had talked with them, and that they were anxious to get the hotel. She said she was tired out and was going to New York, and would not do anything about it until she came back.  That was about January 2, 1899."  On cross-examination the plaintiff testified, in answer to the question, " Did you ever get any offer from Gould and Pollo for that property ? " — " No, because I gave them the terms at that time, the same terms given to Mann, and just at that time Miss Crabtree said she would not do anything about the property."  He also testified on crossexamination that he never got from Gould and Pollo any offer and never communicated to Miss Crabtree or to Mr. Gilman any offer from Gould and Pollo, and that " they always talked about hiring it on the same plan that Mann hired it on."  This testimony falls short of proving an offer to take the hotel on

the terms of the Mann lease, and there is nothing in the rest of the cross-examination which brings this testimony up to being evidence of that fact. On re-direct examination, the plaintiff testified: " I told her [Miss Crabtree] they were ready to hire on the same terms as the Mann lease."

On a fair construction of this testimony as a whole, we are of opinion that the jury were not warranted in finding that Gould and Pollo offered to take the hotel before January 2, on the terms of the Mann lease. The jury were justified in finding that the plaintiff told the defendant that Gould and Pollo were ready to take the hotel on those terms; but taking into account the refusal of the plaintiff to testify that any such offer was made, when he was asked on direct examination what was said by Gould and Pollo to him, and taking into account the explicit statement on cross-examination that no direct proposition was ever made by Gould and Pollo, we think that all the jury would have been justified in finding was that Gould and Pollo were believed by him to be ready to take the hotel on the terms of the Mann lease, but that they never said so and never made an offer to that effect.

> *Exceptions to the ruling on the fifth and sixth counts overruled; exception to the ruling on the fourth count sustained.*