THOMAS J. QUINN *vs.* SMITH P. BURTON, JR.

Suffolk.   January 3, 1905. — June 22, 1905.

Present: KNOWLTON, C. J., MORTON, LATHROP, BARKER, HAMMOND,
LORING, & BRALEY, JJ.

*Agency.   Broker.*

In an action by a broker for a commission for procuring an exchange of real estate
the plaintiff contended that the customer, alleged to have been procured by the
plaintiff, told his broker that he was ready to make the exchange in question
and that the broker told this to the plaintiff and the plaintiff told the defendant
who refused to go on with the trade.  *Held,* that it was not necessary to con-
sider what the rights of the parties would have been if the customer after tell-
ing his broker that he would make the exchange repudiated the transaction, as
the evidence would not warrant a finding that the customer told his broker that
he would make the exchange.

CONTRACT by a real estate broker for a commission in pro-
curing an exchange of real estate.   Writ dated January 6, 1903.

In the Superior Court *Wait,* J. refused to order a verdict for
the defendant, and submitted the case to the jury.   The jury
returned a verdict for the plaintiff in the sum of $1,609; and
the defendant alleged exceptions.

The following is a statement of the evidence held by this
court not to warrant a finding that the alleged customer told his
broker that he would make the exchange in question:

The alleged customer in the case at bar was one Shapleigh.
He had told one McDonald that he would like to dispose of two
houses owned by him, by way of exchange.   These two houses
were situated on Commonwealth Avenue in Boston and were
valued at $40,000 each, and each was subject to a mortgage for
$25,000.   The defendant's farm was free from incumbrances and
was valued by him at $35,000.   The plaintiff testified that he
told the defendant that Shapleigh would not go out to look at
the farm unless the defendant was willing to convey his farm
for the equity in the two houses without any payment by Shap-
leigh, and that the defendant assented to this; that thereupon
Shapleigh went out to Reading, and after his return McDonald
asked the plaintiff if the defendant's furniture at Reading went

with the farm; that the defendant refused to throw in the furniture; that on this being told to McDonald by the plaintiff McDonald said that they would accept it without; that the plaintiff reported this to the defendant, who said that he should not go on with the trade, that he had talked with Shapleigh since and that he, the defendant, thought the plaintiff "could have got one house free and clear" and the defendant could have taken a mortgage back on his farm. The plaintiff testified that he then said that the deal was closed a week ago; that he had not seen the defendant since; that he wrote to the defendant, who replied that the plaintiff had no authority to trade his farm for anything less than $35,000.

Up to this point there was no evidence that Shapleigh authorized McDonald to close the trade he undertook to close with the plaintiff. All that the plaintiff testified to was that McDonald told him that Shapleigh would not consider an exchange unless the defendant was ready to make the exchange without a payment by him, Shapleigh.

After the plaintiff had testified to these facts, McDonald testified to most of the facts above set forth, including Shapleigh's visit to Reading and the witness's call on the plaintiff to see if the furniture was included. McDonald then testified that on receiving this answer Shapleigh asked what he could sell the defendant's farm for and how much he could borrow on it; that he told Shapleigh that he might not be able to sell it right away for cash, but that he could borrow on it and sell it later; that the upshot of this conversation was that Shapleigh wanted him to raise a loan before he really took the title to the farm, and he said that if the plaintiff could do that he would make the trade; and that thereupon McDonald told the plaintiff: "I thought we could close it up all right."

On cross-examination McDonald testified that he understood that to be Shapleigh's position, and that Shapleigh never said anything more authorizing him (McDonald) to close the trade.

Shapleigh then went on the stand as a witness for the defendant, and testified that he asked McDonald how much money he could raise on the defendant's farm, and that McDonald told him $15,000, to which he answered: "That settles it, I don't want it." The only other testimony from Shapleigh was the

fact that he admitted on cross-examination that after this talk he went to the office of one Page, who had introduced him to McDonald, to talk about this matter and to see if Mr. Burton would make the exchange on certain conditions not stated.

The defendant then went on the stand and testified that he never authorized the plaintiff to offer his farm for the equity in the two houses unless he got $5,000 to boot, and that he had since sold his farm to a third person.

Page then was called by the plaintiff, and testified that on the train coming in from Reading the talk was of an even exchange, and Shapleigh told him and McDonald that he would consider exchanging, and that he came into his (Page's) office every day or so in relation to the transaction. On cross-examination this witness testified " that he did not know what terms had been proposed by the defendant; that the trade, so far as he as a broker understood it, was a ' trade, the terms of which still remained to be arranged ' ; that coming in on the train that day he did not undertake to make any bargain with Shapleigh at that time, but left the matter open until the defendant could be consulted ; that he tried to have Shapleigh say what he would do ; that he did not reach the point of closing any trade with Shapleigh, and understood perfectly well ' that the matter lay open because of these unsettled things ' ; that the next day he saw Shapleigh who asked what the chances were of a trade going; that Shapleigh came in for some time right along every day or so to ascertain what was being done and there was no time, so far as he knew, when any definite arrangement was reached so far as his communication with Shapleigh was concerned ; that three or four weeks after November 22, Shapleigh came in and the witness told him upon information which he had received from the other broker (McDonald) that the defendant would not trade; that coming down in the cars from Reading, Shapleigh said something to him about raising the eighteen or twenty thousand dollar mortgage on the place and that very likely he told him it could not be done."

The plaintiff on being recalled testified that Shapleigh said: " I think Mr. Burton played a dirty mean trick on us people to put us to the trouble of going out there to look that place over and then back out." This was denied by Shapleigh.

The case was submitted on briefs at the sitting of the court in January, 1905, and afterwards was submitted on briefs to all the justices.

*S. H. Tyng*, for the defendant.

*J. H. Murphy*, for the plaintiff.

LORING, J. This is an action brought to recover a broker's commission for procuring some one to make an exchange with the defendant for the defendant's farm in Reading.

No contract for an exchange was in fact made, but the plaintiff contends that he has made out a case within *Fitzpatrick* v. *Gilson*, 176 Mass. 477, and *Cadigan* v. *Crabtree*, 179 Mass. 474, 481.

The case at bar is unlike *Fitzpatrick* v. *Gilson* in one respect. In the case at bar no customer was in fact introduced to the defendant, and the terms of a trade were not in fact arranged, which trade subsequently fell through not through the fault of the customer but through the fault of the defendant.

More than that, the person who, the plaintiff contends, was the customer secured by him testified that he never was willing to make the exchange.

All that the plaintiff has asserted is that the customer told his broker that he was ready to make the exchange, and the broker told the plaintiff and the plaintiff told the defendant; and thereupon the defendant refused to go on with the trade.

It might be argued that a broker does not earn his commission until he produces a customer, and that in the case at bar he had not done so because the customer refused to honor his broker's statement that he would make the exchange; that in such a case what the defendant got from the plaintiff was a lawsuit and not a customer. But we do not find it necessary to make a decision on that point because we are of opinion after a careful examination of the evidence that the jury were not warranted in finding that the customer told his broker that he would make the exchange.

*Exceptions sustained.*