WEST v. KIRBY LUMBER CO.
(No. 7156.)

(Court of Civil Appeals of Texas. Galveston. Feb. 2, 1917. Rehearing Denied March 1, 1917.)

1. BROKERS &#8660;86(1)—EXPRESS CONTRACT FOR COMMISSION—EVIDENCE.

In an action by broker for commission for the purchase of land, evidence *held* to show that purchaser made an express contract to pay commissions to broker.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 117, 118.]

2. BROKERS &#8660;44 — PRINCIPAL'S RIGHT OF REVOCATION.

In the absence of an express contract to the contrary, an employer may, in good faith, revoke a broker's authority while negotiations

remain unsuccessful and before commissions are earned.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 45.]

3. BROKERS ⬤⟶44—REVOCATION OF AUTHORITY—SUBSEQUENT SERVICE—COMPENSATION.

Subsequent services by a broker whose authority has been revoked by purchaser does not entitle him to commission.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 45.]

4. BROKERS ⬤⟶88(2)—CONTRACT FOR COMMISSION—REVOCATION—EVIDENCE.

In an action by broker for commission on a purchase of land, evidence of revocation *held* sufficient to require submission to jury.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. §§ 128, 129.]

Appeal from District Court, Harris County; Chas. E. Ashe, Judge.

Action by W. W. West against the Kirby Lumber Company. Judgment for defendant, and plaintiff appeals. Reversed and remanded.

Campbell, Sewall & Myer, of Houston, and Smith, Crawford & Sonfield, of Beaumont, for appellant. Andrews, Streetman, Burns & Logue, of Houston, for appellee.

LANE, J. The nature of the case and proceedings of the trial in the lower court will appear from the statement set out below, which is largely copied from the brief of appellee, and which we think is substantially the same as made by appellant and is supported by the record, to wit:

The plaintiff, in the month of November, 1912, contemplated purchasing the sawmill plant, planing mill and appurtenances thereto, belonging to Simmons Bros. Lumber Company, a copartnership composed of E. C. and R. M. Simmons, situated in Jasper county, Tex., and the pine timber owned by R. C. Conn on various tracts of land in Jasper county, the said timber being embraced in a certain cutting or stumpage contract between R. C. Conn and Simmons Bros. Lumber Company of date November 22, 1911.

The cutting or stumpage contract referred to was between R. C. Conn, Simmons Bros. Lumber Company, and Chicago Lumber & Coal Company of Texas, a corporation. It conveyed to Simmons Bros. Lumber Company the sound merchantable pine timber 10 inches in diameter and upwards, measured 18 inches from the ground, on all pine timber where Conn's purchasing contracts would permit and all other sound merchantable pine timber 12 inches in diameter and upwards measured likewise, on about 38 tracts of land in Jasper county. The contract covered, in addition, all other pine timber which Conn should thereafter purchase during the life of the contract contiguous to said described land. Simmons Bros. agreed to pay Conn $4.50 per thousand feet for the timber, payments to be made on the 10th day of each month. Simmons Bros. further agreed to cut 600,000 feet of timber per month and pay for that much every month whether cut or not in addition for all cut in excess of that amount. Failure to make payment at the time provided for was to work a forfeiture of the contract at Conn's option. Simmons Bros. were required to cut all timber at a height not more than 18 inches from the ground and to cut all timber clean off of each tract, when cutting should be once begun on a tract. Simmons Bros. were required to cut last the timber on tracts 1, 2, and 3. Scalers agreed upon were to be paid one-half by Conn and one-half by Simmons Bros. Scalers not agreed upon were to be paid by the party employing them. The Devant-Herrin scale stick was to be used. Simmons Bros. could not cut any of the timber until they had first cut the timber covered by a prior contract between the parties, but were required to commence cutting this timber immediately after the timber embraced in the prior contract had been cut. Simmons Bros. could buy no timber to be cut by them at their mill during the life of the contract, except from Conn at $4.50 per thousand. The Chicago Lumber & Coal Company guaranteed the payments by Simmons Bros. to Conn.

The plaintiff at said time, to wit, in November, 1912, called upon Mr. B. F. Bonner, vice president and general manager of the Kirby Lumber Company, with a view to obtaining from the Kirby Lumber Company a right of way over its lands should he consummate his purchase of said Simmons Bros.' mill and Conn timber, and was advised by Mr. Bonner that the Kirby Lumber Company would not grant such right of way. Mr. Bonner stated to the plaintiff that if plaintiff could buy the property for the Kirby Lumber Company, the company would compensate him if it was bought, and asked plaintiff to negotiate for the Kirby Lumber Company if it was satisfactory with Mr. Kirby, the president of the company, and stated, further, that he would take the plaintiff in to see Mr. Kirby.

The plaintiff thereupon went in to see Mr. Kirby, and, after discussing the matter, the agreement which he and Mr. Kirby arrived at, stated in his language, was as follows:

"Mr. Kirby told me he would like for me to go over there and get a proposition on it, develop the facts in connection with it, and that if the Kirby Lumber Company purchased it, they would compensate me for my services. The negotiations were to be conducted in my name, as there was an impression out in some way that there was not the best of feeling between the Kirby Lumber Company, or Mr. Kirby personally, and Mr. Conn. I suppose I suggested that the negotiations be conducted in my name; I know it was understood that they were to be; Mr. Kirby agreed to that."

Thereafter the plaintiff, having been referred by Simmons Bros. to John B. Warren of Houston, went to Kirbyville in Jasper county with Mr. Warren. At Kirbyville he saw R. M. Simmons and Eugene Simmons (Sim-

mons Bros.) and R. C. Conn. He stayed at Kirbyville two or three days, and while there went out to the said mill. He looked around there, but did not spend any great amount of time in the mill. He did not take any inventory of the mill property. Simmons Bros. just told him what they had. He looked over the Conn timber on the same trip, riding horseback in doing so. He rode over the timber and inspected the mill a good long time before he came to see Mr. Bonner about getting a right of way. He thought Mr. Kirby would have the timber cruised before buying it. He and Warren, at the hotel at Kirbyville, made some figures as to the different quantities of timber on the tracts of land, but he did not preserve the figures.

Simmons Bros. and Conn did not make any proposition to plaintiff in writing. Several propositions were talked over, and Simmons Bros. said they preferred to sell outright and sell it unincumbered—to sell it for a price sufficient to pay off its indebtedness and sell it unincumbered. Conn was not friendly to it, and did not favor the sale of the mill. Plaintiff did not remember whether or not Conn made a proposition as to what he would take for the timber, and did not believe he had gotten a proposition from Conn. Mr. Warren testified, and the plaintiff did not dispute the testimony, that along about the latter part of the negotiations he and the plaintiff went to Mr. Conn's private office over the latter's bank at Kirbyville to ascertain whether Mr. Conn would consent to an assignment by Simmons Bros. of their contract with Conn, and that Mr. Conn refused to do it. Mr. Warren further testified that Mr. Conn was very much opposed to an assignment of said contract.

The plaintiff finally got from Simmons Bros. "a proposition to sell to Mr. Kirby the whole works, timber and all; Simmons Bros. were to sell the timber and mill and pay Mr. Conn off out of the proceeds. The price was $360,000." The terms were not agreed on. Plaintiff just got a price of $360,000.

Mr. Warren testified, and his testimony was not disputed by plaintiff, that in his office in Houston, before he and plaintiff went to Kirbyville, he told plaintiff that Simmons Bros. claimed to have 60,000,000 or 65,000,000 feet of timber up there, and that sawmill and considerable lumber on the yards, and they wanted $360,000 for the timber, mill, and lumber and everything connected with the plant. Mr. Warren further testified, and his testimony in this respect, was not disputed by plaintiff, as follows:

"Mr. West made a statement to me at that time as to what he thought of the $360,000 price. Of course, he thought that was too much. That price was based on an estimate of 60,000,000 or 65,000,000 feet of timber, and when Mr. West found out there was only in his judgment about 37,000,000 feet, or not over that, he thought $360,000 was too much, and stated that to me quite often, and I thought so too. Mr.

West did not succeed in getting a proposition of any less figure than $360,000 when he was there at Kirbyville. We never succeeded in getting any less direct proposition. We went to Mr. Conn and talked to him with the idea of trying to convince him there was not any 60,-000,000 or 65,000,000 feet of timber there, and there was not any 50,000,000 feet there. Mr. Conn's estimate was that there was about 50,-000,000 or 55,000,000 feet, and we argued with him that the arbitrary price he had put on his interest in the timber was too much. Mr. Conn wanted $200,000 in cash for the timber."

After the plaintiff "got the price" of $360,-000, he came back to Houston. He told Mr. Kirby it was not a good price. He told Mr. Kirby that the price he "got was $360,000 for the Conn timber and the Simmons Bros. mill." He did not consider the $360,000 proposition a good price because they did not have the timber. He testified in this connection as follows:

"The $360,000 proposition contemplated the purchase of the Conn timber. It contemplated the purchase of the entire property from Simmons Bros.—and they were to pay Conn—in other words, unincumbered. The Conn timber was to be sold outright. I told Mr. Kirby that I thought the better way to handle it would be to buy the Simmons Bros. mill and take up this contract."

Plaintiff does not fix the date of this conversation with Mr. Kirby. Mr. Warren testified, and plaintiff did not dispute the fact, that he came back from Kirbyville as far as Beaumont with plaintiff, and that he got back to Houston on Sunday night; that he did not call on Mr. Kirby the next day, but called on Col. Ball and told him he thought there was a chance for the Kirby Lumber Company to get that timber; that Col. Ball tried to get Mr. Kirby on the telephone, but Mr. Kirby was in Chicago, and Col. Ball asked him to wait until Mr. Kirby got back. Mr. Warren further testified:

"When Mr. Kirby got back, the very day he got back, I went up to see him and told him that there was a chance for him (Kirby) to buy that timber, and I told him I thought he ought to have it; that his mill was there at Kirbyville and his tram ran through this timber, and he was in a position to pay more for it than anybody else, and that I was authorized to present it to him on a basis of $360,000 for the mill, the lumber and the timber, and that Simmons Bros. had given me that price on a basis of there being 60,000,000 or 65,000,000 feet of timber there. My conversation with Mr. Kirby was not very long. He just simply told me: 'If there is that much timber there, I will take it—all I want is about two or three weeks to have it estimated by Weathersby.'"

Mr. Warren further testified:

"Mr. West had not said anything to me about whom he was getting a price for up there at Kirbyville. I did not know at the time I called on Mr. Kirby that Mr. West had any connection in the world with Mr. Kirby in the matter at all, and did not have even a suspicion of it. Nothing was said at the conversation I had with Mr. Kirby with reference to Mr. West's having gotten a price for him."

When plaintiff told Mr. Kirby that he did not consider the $360,000 price a good price, that it was too high, Mr. Kirby said he could not tell about that until he had it estimated—

until he had a detailed estimate made of it—until he had it "cruised." Mr. Kirby said he would send Mr. Weathersby over and have a cruise made of it. Plaintiff testified that he agreed with Mr. Kirby that there should be more of a detailed estimate than plaintiff had furnished, and that Mr. Kirby told him that he was going to send timber estimaters up there to go carefully over each tract.

It was alleged by the plaintiff, and plaintiff testified that the allegation was true, that he was advised that Simmons Bros. Lumber Company, not knowing the fact that the Kirby Lumber Company was the intended purchaser, and that the negotiations theretofore conducted between the said Simmons Bros. Lumber Company and the plaintiff were for and in behalf of the Kirby Lumber Company, intended to open negotiations with the Kirby Lumber Company looking to the sale of the property to it. He testified that Mr. Warren told him that he (Warren) was going to Kirby.

It was further alleged by plaintiff, and also testified by him, that thereupon he so advised the defendant Kirby Lumber Company, through Mr. Kirby, and "it was deemed best that the plaintiff stand aside and let the negotiations be conducted thereafter directly between Simmons Bros. Lumber Company and the defendant Kirby Lumber Company."

Under date of November 28, 1912, R. M. Simmons and E. C. Simmons (Simmons Bros.) submitted to Mr. Kirby the following proposition in writing:

"As a result of our conference with you in your office in Houston on last Tuesday, we herewith make you an offer on our timber holdings, mill, live stock, lumber, etc. For a consideration of $360,000.00 to be paid us by you in cash or one-half cash and the balance in short term notes, which must be acceptable to us, deferred payment to bear legal rate of interest, we hereby agree to transfer to you all our rights, title and interest to the following property: All the timber included in the contract between R. C. Conn and E. C. and R. M. Simmons of date November 22, 1911, subject to the tenor of the deeds of acquirement of R. C. Conn, that is, it being our intention to deed or to have deeded to you all the rights of the said R. C. Conn and E. C. and R. M. Simmons, also all rights with reference to stumpage, right of ingress and egress, etc., as recited in the deeds made to R. C. Conn by the several grantors. Be it understood that the timber included in the aforementioned contract, which R. C. Conn owns in fee simple, that is, land and timber, that eight years of time from date will be allowed in which to remove the timber and that rights of ingress and egress and other privileges necessary to the logging of the timber will be accorded. In addition to the foregoing timber, we will transfer all the timber the said R. C. Conn has acquired contiguous to that specified in the contract before referred to upon the same conditions as recited in the contract as to time of removal, etc. approximating 964¼ acres. It is our intention to transfer to you all rights that we have acquired as a result of the contract of November 22, 1912, and that of an option of a later date."

Here follows a description of the sawmill, planer, dry kiln, houses, timber, lumber, and other personal property, the offer concluding as follows:

"Would suggest that you have your men come and look the plant over. They can form an idea of its value, and can better acquaint you with our holdings than we can by letter. This offer will remain in full force and effect until December 15, 1912, and will after that date become null and void."

Plaintiff's witness, R. M. Simmons, with reference to said proposition in writing, testified:

"Attached to said proposition is a proposition to E. C. and C. R. Simmons (who are Simmons Bros.) from R. C. Conn, of date November 27th, which is the day before our proposition to Mr. Kirby, November 28th. * * * That was an agreement between Mr. Conn and myself with reference to the way we could settle, provided it was sold to Mr. Kirby, and before I made that proposition to Mr. Kirby I wanted to know what Mr. Conn would agree to, because I did not want to make Mr. Kirby a proposition until I was satisfied everything was agreeable with Mr. Conn, and that I could turn over to Mr. Kirby what I agreed to do."

The witness further testified that at the conversation he had with Mr. Kirby about the $360,000 proposition, which was in the latter part of November, Mr. Kirby stated that if the deal was made he would have to take care of Mr. West in the matter; he would have to pay Mr. West a commission.

Plaintiff testified that after he went to Kirbyville and secured the proposition, the next he heard from the proposition he had a letter from Mr. Kirby in answer to a letter from him. In his letter to Mr. Kirby, dated December 10, 1912, he said:

"Now as the Simmons Brothers have taken the matter up with you direct, I would like to know what position you take in the matter as regards my interest in it. As the understanding with you was that in case you purchased the property that I was to get a commission on it, I would like to know whether you would now consider that I am entitled to the commission since you have commenced negotiations with them direct. As stated to you I was in the market for something like this, but that if you wanted it, I would assist you to get it and would not make any offer only as your agent, but now if you think otherwise, I wish you would so advise me, in order that I may feel absolutely free to negotiate with them in my own capacity, if I should desire to do so."

Mr. Kirby replied by letter the following day, saying:

"I think I understand conditions clearly and I have no disposition to do other than as we first talked, that is in the event the deal is of interest to me to compensate you for your trouble as far as you have gone. I should like to have you indicate to me, however, just what you think this compensation should be. As explained to you at our interview on Monday, I cannot tell whether this deal will be regarded by our people as desirable until our cruisers have completed an estimate of the timber involved. I have made no commitment to anybody to purchase the property on any basis and am only considering the purchase to the extent of having the timber cruised—when that work is completed we shall come to a prompt decision as to whether the purchase interests us and that decision will be somewhat influenced by the amount of compensation you expect out of the deal."

The plaintiff replied on December 13th as follows:

"I advised you that the Conn proposition would not interest me, but for a commission I would look into it and see if a satisfactory deal could be worked up for you. I will make this commission on a 2½% basis on the entire amount of the purchase price from both Conn and Simmons, but I would want you to advise me as soon as you have come to a decision in the matter as to whether you will take it or not."

Mr. Kirby on the same day, answered this letter as follows:

"I note that in the event we purchase the Simmons Brothers Lumber Company property you will expect a commission of 2½% upon the purchase price paid for the entire property whatever it may be. I shall consider the negotiations with this in mind and in the event of any deal under the proposition now pending your commission will be paid."

Under date of December 16th, Mr. Kirby wrote Simmons Brothers as follows:

"We did our best to conclude the cruise of the Conn timber before the 15th, but it could not be accomplished and do the work in a thorough manner. I am just now in receipt of Mr. Weathersby's estimate of the timber and I write to advise you that at the price quoted, namely, $360,000.00 for the entire property, we could not entertain the purchase."

On the same day, Mr. Kirby wrote the plaintiff inclosing a copy of this letter to Simmons Bros., and saying:

"I do not think from what Simmons Brothers said to me that there is any likelihood whatsoever that we will get together on any deal, so, if you wish to open negotiations for your personal account, you are at liberty to do so, so far as we are concerned."

The plaintiff's witness R. M. Simmons testified:

"When I put the $360,000 proposition up to Mr. Kirby, covering the Conn timber and the Simmons Bros. mill and properties, I do not know whether I said to Mr. Kirby that that was the final figure on it. The way I figured it, the amount which Mr. Conn expected to get for his timber placed me in a position where I could not make a proposition of less than $360,-000. I considered my property was worth so much, and Conn wanted so much. I think that one proposition Mr. Conn made to us for his timber was something like $195,000, if I remember right. The proposition I first made Mr. Kirby contemplated the outright fee-simple sale of the Conn timber and of our properties. As I stated in that contract, it was to clean up everything and take everything we had. It did not contemplate the Kirby Lumber Company's buying my mill and stepping into my shoes on the Conn contract; I did not so construe it. * * * My brother disliked the idea of selling this contract out to any one else, and Mr. Conn was adverse to it."

Under date of December 17, 1912, the plaintiff wrote a letter to L. J. Boykin, of Houston, who was then general manager of the Chicago Lumber & Coal Company of Texas. In this letter, after referring to the trade between Mr. Kirby and Simmons Bros. Lumber Company, he said:

"I have advice from Mr. Kirby several days ago that he was having the timber estimated, and as soon as he had completed it he would be ready to take up the trade. He indicated, however, that he thought the proposition they had made him was such that it would be hard

for them to get together, unless it was materially reduced. He stated, I believe, that they had made a price of $360,000 for the property unencumbered."

He then suggested that Mr. Boykin, if he had sufficient interest in the matter, talk the matter over with Simmons Bros. and see if he could not get them to agree to deal with Mr. Kirby on the basis of having him succeed to their rights in the stumpage contract with Conn, letting Mr. Kirby pay Conn and pay Simmons Bros. a bonus of 50 cents per thousand feet for the timber and an agreed price for the improvements.

On December 20, 1912, Simmons Bros. wired Mr. Kirby, inquiring whether they could see him in Houston on the following Monday, which was December 23d, and Mr. Kirby replied by wire in the affirmative. On December 21, 1912, L. J. Boykin mailed to Simmons Bros. at Kirbyville a copy of the plaintiff's letter to him of date December 17th.

The plaintiff's witness R. M. Simmons testified:

"I received the letter from Mr. Boykin [meaning the one inclosing copy of plaintiff's letter of December 17th] on Sunday. I reached Houston that Sunday night (December 22nd). With respect to how long before I saw Mr. Kirby, it was that I had conceived the idea of making a deal with him by having him step in my shoes in the Conn contract, after I received Mr. Kirby's letter. Then I began to figure on how Mr. Kirby and I could get together, and the thought occurred to me—knowing, however, that my brother objected to it. That thought was one of the reasons that caused me to send the telegram to Mr. Kirby. I thought possibly I might get together with him on the original proposition. The thought had also occurred to me that I might be able to make a deal with Mr. Kirby or with the Kirby Lumber Company, by having it step into my shoes on the Conn contract, and then I sent the telegram to Mr. Kirby and made an appointment with him for another date. As to whether when Mr. Kirby wrote me the letter of December 16th and said he could not entertain the purchase, he did not ask me to come and meet him at any time or anywhere and discuss the matter with him. I do not remember the contents of said letter. If he did not ask me to do so in that letter, he did not otherwise ask me to do so. Mr. Kirby did not seek an appointment with me at a subsequent date; I am the man who sought the appointment."

This witness further testified:

"I came to see Mr. Kirby on December 23d because it developed we could not make the trade on the basis of $360,000. * * * I do not know whether I offered to make any deduction in the $360,000 or not; possibly I did; I do not remember that circumstance. * * * I should think it had resolved itself into the proposition that when I got to Houston I had dropped the $360,000 proposition and consulted with Mr. Kirby with reference to a different sort of proposition. Originally the suggestion of Mr. Kirby's taking the mill and stepping into my shoes in this Conn contract came from me. I put that proposition to Mr. Kirby myself; that is as I thought of the proposition originally, but then there were other reasons why I did it. It was after conference with my associates. I do not know whether that proposition occurred to me before it did to anybody else or not."

With respect to the conversation between Mr. Kirby and Mr. Simmons on December

23d, and the result thereof, Mr. Simmons testified:

"The substance of said conversation was that we were unable to get together with Mr. Kirby on the original proposition, and we came at him with a different proposition, and as a result of that different proposition we were, after discussing the proposition with Mr. Kirby turned over to Mr. Bonner and Mr. Myer."

As a result of the discussion between Mr. Simmons, Mr. Bonner, and Mr. Myer, it was agreed that the Kirby Lumber Company should take over the Simmons Bros.' holdings, together with their contract with Conn for the price of $100,000, under the condition that Simmons Bros. were to have what they said they had, the Kirby Lumber Company reserving the right to look the property over, and the proposition being subject to Mr. Kirby's concurrence. The further understanding was that if the proposition went through, Simmons Bros. were to operate the mill from that time on, as of date December 23, 1912, for the benefit of the Kirby Lumber Company, on a salary basis for the two brothers. About 8 or 9 o'clock on same night, after Mr. Bonner had seen Mr. Kirby, he notified Simmons that the proposition just mentioned was accepted. On the following day, December 24, 1912, Mr. Bonner wrote the plaintiff as follows:

"Referring to the Simmons Brothers deal: Mr. Kirby has already advised you that we turned the matter down and stated to you that if you were interested personally for you to negotiate with them on your own account. We accordingly notified Simmons Brothers that the matter was of no further interest to us. It seems now that Simmons Brothers desire to deal with us on an entirely different basis and have so approached us. We may be disposed to consider the matter on this present basis, but in doing so, it is fair to you to state that it does not include any commission to you from us, and if we go forward with the deal on the new basis, we will not expect to pay you any commission. If you wish to consider the purchase of the property for your own account, advise us, and we will keep out."

The plaintiff answered under date of December 28th, as follows:

"I do not think the position you take with reference to the Simmons matter is correct, and I shall expect settlement upon the basis of Mr. Kirby's letter of the 13th inst., if you should buy it. I do not think I would be open to negotiate for the purchase of the Simmons' property now, as immediately after I received Mr. Kirby's letter I made arrangements which will now conflict with the purchase of this property."

On January 29, 1913, the deal with Simmons Bros. Lumber Company was consummated by an instrument in writing, whereby Simmons Bros., for a consideration of $100,000, conveyed to Kirby Lumber Company their sawmill and other personal properties, and assigned to Kirby Lumber Company their contract with R. C. Conn, the obligations of which the Kirby Lumber Company assumed. R. C. Conn was in no way a party to the transaction. Thereafter the plaintiff wrote the Kirby Lumber Company a letter, demanding a commission of $5,991.20. Appellant,

West, sues for $7,000, the sum which he alleges is due by the Kirby Lumber Company under the contract alleged by him, the same being 2½ per cent. on the $100,000 paid by the Kirby Lumber Company for the mill, and 2½ per cent. on $180,000, estimated to be paid by the Kirby Lumber Company for the Conn contract, aggregating 2½ per cent. on $280,000. Appellant also prayed that, in the event the court should hold that he could not recover under the alleged contract, he be permitted to recover on the quantum meruit.

Appellee, the Kirby Lumber Company, contends that the proposition of sale obtained by West from Simmons Bros. Lumber Company was rejected by it; that West was notified of such rejection, and that he was also notified that his services were no longer desired by the Kirby Lumber Company in connection with the purchase of said properties, and that he was at liberty to negotiate such purchase for himself if he so desired, and that thereby the former contract and agreement between the Kirby Lumber Company and him was in good faith revoked, and terminated before appellee purchased said properties, and therefore appellant, West, is not entitled to recover in this cause. It further contends that if appellant did any act or thing, intending to bring about the sale to it, or which did in fact aid in bringing about said sale, after said revocation, which it denies, said plaintiff was a mere volunteer in so acting, and therefore appellee is not liable to plaintiff on the quantum meruit.

Appellant, West, pleaded by supplemental petition that said contract was not revoked by the Kirby Lumber Company in good faith, but that it attempted to revoke same to avoid payment of commissions to West.

After hearing the evidence, the trial court peremptorily directed the jury selected to try said cause to return a verdict for the defendant, Kirby Lumber Company, which they accordingly did.

The only question presented for our determination is: Was there sufficient evidence to require the court to submit the case to the jury?

As before shown by the preliminary statement herein, John H. Kirby, for the Kirby Lumber Company, employed appellant, West, to negotiate with Simmons Bros. for the purchase of their properties, together with the Conn timber, for said Kirby Lumber Company, and that it was agreed between Kirby and West that said negotiations should be conducted in the name of West; that West began negotiations as agreed upon; that while said negotiations were going on West learned that Simmons Bros. were going to approach the Kirby Lumber Company direct with a view of selling said properties to it, without having learned that West was negotiating for said lumber company. Thereupon West wrote John H. Kirby that Simmons Bros. would take the matter up with his

company direct, and that he thought it advisable for him to stand aside and let the negotiations proceed directly between said Lumber Company and Simmons Bros. After such negotiations had been going on for some time, appellant, West, on the 10th day of December, 1912, wrote Kirby that as the understanding between them was that in case he purchased the properties for his company he, West, was to get a commission on the purchase price, he would like to know whether Kirby considered that he, West, was entitled to a commission, since Kirby had commenced negotiations directly with Simmons Bros.; that he wanted to be advised of Mr. Kirby's attitude in the matter in order that if he was not to get a commission in case the Kirby Lumber Company should purchase, he might feel free to negotiate with Simmons Bros. in his own interest, if he so desired. Mr. Kirby replied to this letter at once, saying that he had no disposition to do other than as they first talked, and that in the event he found the deal of interest to him, Kirby, he would compensate West for his trouble as far as he had gone, and asked West to indicate to him just what he, West, thought this compensation should be. On the 13th day of December, 1912, West wrote Kirby as follows:

"I advised you that the Conn proposition would not interest me, but for a commission I would look into it and see if a satisfactory deal could be worked up for you. I will make this commission on a 2½% basis on the entire amount of the purchase price from both Conn and Simmons, but I would want you to advise me as soon as you came to a decision in the matter as to whether you will take it or not."

On the same day Kirby, in reply, wrote West as follows:

"I note that in the event we purchase the Simmons Brothers Lumber Company property you will expect a commission of 2½% upon the purchase price paid for the entire property whatever it may be. I shall consider the negotiation with this in mind and in the event of any deal under the proposition now pending your commission will be paid."

Under date of December 16th, Mr. Kirby wrote Simmons Bros. as follows:

"We did our best to conclude the cruise of the Conn timber before the 15th, but it could not be accomplished and do the work in a thorough manner. I am just now in receipt of Mr. Weathersby's estimate of the timber and I write to advise you that at the price quoted, namely, $360,000.00 for the entire property, we could not entertain the purchase."

On the same day Mr. Kirby wrote the plaintiff, inclosing copy of this letter to Simmons Bros., and saying:

"I do not think from what Simmons Brothers said to me that there is any likelihood whatsoever that we will get together on any deal, so, if you wish to open negotiations for your personal account, you are at liberty to do so, so far as we are concerned."

After appellant, West, received the letter of December 16th, without the request or knowledge of the Kirby Lumber Company, or any agent of said lumber company, he did some other things, unnecessary to be mentioned, in an effort to get Simmons Bros. to submit a proposition different from the one first submitted, with a hope that the two companies might get together and consummate a trade. Simmons Bros. did thereafter, to wit, on the 23d day of December, 1912, sell to the Kirby Lumber Company their mill for the sum of $100,000, and also all rights they had under the Conn timber contract, the consideration to be paid for said timber to be ascertained as provided in said Conn contract. On the following day, December 24, 1912, Mr. Bonner for the Kirby Lumber Company wrote appellant, West, as follows:

"Referring to the Simmons Brothers' deal: Mr. Kirby has already advised you that we turned the matter down and stated to you that if you were interested personally for you to negotiate with them on your own account. We accordingly notified Simmons Brothers that the matter was of no further interest to us. It seems now that Simmons Brothers desire to deal with us on an entirely different basis and have so approached us. We may be disposed to consider the matter on this present basis but in doing so, it is fair to you to state that it does not include any commission to you from us, and if we go forward with the deal on the new basis, we will not expect to pay you any commission. If you wish to consider the purchase of the property for your own account advise us and we will keep out."

To this letter appellant replied saying that he would expect settlement upon the basis of Kirby's letter of December 13th above quoted. On the 29th day of January, 1913, the Simmons Bros. Lumber Company, by an instrument in writing, conveyed to the Kirby Lumber Company their sawmill and appurtenances for $100,000, and by the same instrument assigned to said Kirby Lumber Company the Conn timber contract.

[1] We think that it is clear from what has been stated that appellee expressly contracted and agreed with appellant that if it finally acquired the properties in question that it would pay appellant 2½ per cent. commission on the purchase price of the same. We, therefore, conclude that if appellant is entitled to recover in this suit at all such recovery must be upon the express contract and not upon the quantum meruit.

Having reached the conclusion that appellant was employed by the Kirby Lumber Company to negotiate a trade with the Simmons Bros. Lumber Company, with the express agreement that if the trade was consummated, Kirby Lumber Company would pay appellant 2½ per cent. commissions on the purchase price, we think he should recover under such contract 2½ per cent. on the sum of $100,000, the price paid for the mill properties, and also 2½ per cent. on whatever sum may be shown by the evidence to be the value of the Conn timber contract, unless appellee, Kirby Lumber Company, rightfully and in good faith revoked and terminated the agency of appellant prior to its purchase of said properties on the 23d day of December, 1912.

[2, 3] The questions then are: First, did the Kirby Lumber Company revoke and

terminate said agency prior to its purchase of said properties? and, second, if said agency was so revoked and terminated, was it rightfully and in good faith so revoked and terminated, not for the purpose of escaping the payment of commissions justly earned by the agent, but for the purpose only of promoting the best interest of said Kirby Lumber Company? In vol. 4, R. C. L. pp. 316, 317, it is said:

"In the absence of an express contract to the contrary, if the employer acts in good faith, not seeking to escape the payment of commissions, but moved fairly by a view of his own interest, he has the absolute right before a bargain is made, while negotiations remain unsuccessful, before commissions are earned, to revoke the broker's authority, and the latter cannot thereafter claim compensation for a sale made by the principal, even though it be to a customer with whom the broker unsuccessfully negotiated, and even though, to some extent, the seller might justly be said to have availed himself of the fruits of the broker's labor. Cronin v. Am. Sec. Co., 163 Ala. 533, 50 South. 915, 36 Am. St. Rep. 88; Cadigan v. Crabtree, 179 Mass. 474, 61 N. E. 37, 55 L. R. A. 77, 88 Am. St. Rep. 397; Cadigan v. Crabtree, 186 Mass. 7, 70 N. E. 1033, 66 L. R. A. 982, 104 Am. St. Rep. 543. Once a broker's authority has been lawfully revoked, if he continues to render any services to his former employer, they must be deemed to be voluntary, and are accordingly ineffectual to entitle him to commission on a sale made by the owner himself subsequent to such termination of his authority." Note 139 Am. St. Rep. 229.

This seems to be the rule as established by the great weight of authority.

[4] After a careful examination of all the evidence, we conclude that there was sufficient evidence to require the court to submit to the jury the questions as to whether the agency of appellant was revoked and terminated by appellee prior to the sale and purchase of the said properties, and, if so, was the same rightfully and in good faith so revoked and terminated, and we therefore further conclude and find that the trial court erred in peremptorily instructing the jury to find for appellee, for which error the judgment of said court is reversed and the cause remanded.

Reversed and remanded.