JOHN J. CADIGAN *vs.* LOTTA M. CRABTREE.

Suffolk.    January 13, 14, 1904. — May 20, 1904.

Present: KNOWLTON, C. J., LATHROP, BARKER, HAMMOND, & BRALEY, JJ.

*Agency.    Broker.*

If the owner of real estate employs a broker to lease it on terms to be approved by the owner, and the broker procures an offer which the owner rejects, and thereupon the owner in good faith revokes the authority of the broker and ceases to employ him, if the owner afterwards honestly changes his mind and leases the real estate to the tenant originally procured by the broker, the broker is entitled to no compensation for the lease made after the termination of his employment.

CONTRACT to recover a commission · for services as a real estate broker. Writ dated July 29, 1899.

The case was before this court at a previous stage as reported in 179 Mass. 474, where the pleadings and the evidence presented at the first trial before *Morton*, J. are described. The defendant's exceptions having been sustained by that decision, there was a new trial before *Loring*, J., who made the rulings stated in the opinion of the court. The jury by direction of the justice returned a verdict for the defendant on the third count. On the fourth count the jury returned a verdict for the plaintiff in the sum of $3,257.37 ; and the defendant alleged exceptions.

*F. Paul,* for the defendant.

*S. L. Whipple & W. R. Sears,* for the plaintiff.

HAMMOND, J. This is an action by a real estate broker to recover a commission upon a lease. So far as material to the question before us, the evidence for the plaintiff, taken in the light most favorable to him, tended to show the following facts: About November 1, 1898, the defendant employed the plaintiff to procure a tenant for certain real estate owned by her. He saw several persons on the matter, among whom were one Gould and one Mann. With the latter negotiations were soon begun which finally resulted in an agreement as to terms, and in the preparation of some papers. The Mann lease, however, "fell through" on December 20, 1898, because the person who was to become the surety for the tenant changed his mind and withdrew. Directly after this the plaintiff renewed his negotiations with Gould, and within a day or two told the defendant that he thought he could get a good tenant, mentioning Gould, whom he said he would "see right away," and she said to him "All right, go ahead." On December 22, the plaintiff had an interview with Gould and Pollo, who were acting together, showed them certain plans, told them what the terms of the Mann lease were, and said that those were the only terms on which the property could be hired. They said they would think it over. The plaintiff reported this interview to Gilman, the general agent of the defendant, who said he would see what could be done. In two or three days Gilman said he could not get the defendant to decide to do anything at that time. On the first or second of January, the defendant and the plaintiff, according to his testimony, had an interview in which the plaintiff told the defendant about his talks with Gould and that the latter was satisfied with the terms of the Mann lease. The defendant said in substance that she had decided not to lease but to sell. "She would not talk lease at all." The plaintiff did not see the defendant again. He wrote to her two or three times between January 2 and February 8, the substance of the letters being that he could not sell the property for the price named by her, and that she had better lease it, mentioning Gould and Pollo. She replied on February 8 that the property was "for sale only." Meanwhile the plaintiff saw Gould and Pollo "every

little while" and talked with them about the defendant. By letter dated March 3, the defendant informed the plaintiff that she had withdrawn the property from the market for sale, had decided to lease it and had placed it in the hands of one Fitzpatrick as her sole agent, who alone had authority to negotiate for her. Up to the time the plaintiff received this letter of March 3, he never had heard that any other broker was having anything to do with the business of leasing the property, and during this whole time he was ready and willing to act as a broker in carrying on negotiations for the lease to Gould and Pollo. Neither Gould nor Pollo, acting together or separately, ever agreed with the plaintiff to take the lease, nor did either of them authorize the plaintiff to convey to the defendant an offer. The negotiations never reached that point. On December 28 or 29, the plaintiff, at the order of the defendant acting through Gilman, took down his sign from the estate.

On December 20, 1898, the day the negotiations for the Mann lease ended, the defendant met Fitzpatrick, a real estate broker, mentioned above, who also had been talking with Gould for several months about hiring the property. In this interview Fitzpatrick spoke of Gould and Pollo as persons who would be good tenants, and asked the defendant to give them a lease, but she declined to consider the question of leasing the property, and she continued in this frame of mind until March 3, when, after discussion with Fitzpatrick as to whether to sell or lease, she finally again changed her mind and placed the property in his hands as her sole agent to lease. This was her first employment of Fitzpatrick. On March 12 she saw Gould for the first time, and on March 16 the lease was made to him and Pollo. It was not contended by the plaintiff that the defendant, in deciding not to lease, acted in bad faith. It is to be noted also that the testimony was conflicting as to whether the plaintiff had the interview with the defendant between December 20 and January 2, as to which he testified. The defendant testified that no such interview took place, and that after the conclusion of the negotiations as to the Mann lease on December 20 she did not see or have any communication with the plaintiff until the interview in January. The jury might have believed the plaintiff, however, and we have assumed that they did.

The case was tried upon the third and fourth counts of the declaration. At the close of the evidence the justice ordered a verdict for the defendant on the third count. As to the fourth count the justice ruled that the jury would not be warranted in finding for the plaintiff upon the ground " that the plaintiff was the predominating, efficient cause of the lease given by the defendant to Gould & Pollo and that his services brought about the making of that lease." The justice further ruled that the terms of the Mann lease, so called, " were not substantially the same as,the terms of the lease . . . to Gould & Pollo, and that the action could not be maintained upon the fourth count, in so far as a finding for the plaintiff involved a finding that said leases were substantially alike in their terms." The justice, however, declined to rule as requested by the defendant that the action could not be maintained upon this count, and then submitted the case to the jury, upon instructions to which no exceptions were taken.

The question is whether the justice erred in refusing to order a verdict for the defendant upon the fourth count. The principle upon which the case was submitted to the jury was stated by the justice in the following language: " If the owner of property employs a broker to find a customer for him, and the broker introduces to the principal a person who he says is willing to negotiate, and if the principal and the customer enter into negotiations, and while these negotiations are going on they are suspended, or for the time, at any rate, ended by the principal and not by the customer, and afterwards the principal should close the trade with that customer, the broker is entitled to his commission. I say 'if afterwards the principal should close the trade with that customer,' and I say 'if the negotiations are ended or suspended by the principal and not by the customer.' It is not enough that the broker gives the names of John Smith or Henry Jones, and afterwards the principal should, through the negotiations of another broker, close a trade with John Smith or Henry Jones; the broker cannot entitle himself to a commission by simply having given the name of John Smith or Henry Jones; if he does not do anything more than that he is not entitled to a commission; even if he names them as customers, if he reports that to his principal it is not enough; the

matter has got to go further. It must result in negotiations between the customer and the principal, after the customer has been introduced by the broker. If negotiations begin, and, before they have resulted in a refusal by the principal of the customer's terms, they are suspended merely, and are subsequently resumed, — I am putting a case where the negotiations are begun and are suspended by the principal without having come to a definite conclusion, because they cannot trade at that time, and afterwards the principal trades with that customer, — a commission is due the broker. If, however, the negotiations are ended by the customer making an offer which is refused, then that ends that introduction so far as the question of a broker's commission is concerned. For instance, in this case, you will remember that in November, Mr. Cadigan brought an offer. It was stated by Mr. Gould that he would not give any more than a sum then named, and that this statement was not a definite offer, but Mr. Cadigan brought it as an offer to the defendant; I think it was $25,000 a year and the owner to make all the repairs. Miss Crabtree refused definitely to take that offer. That ended that as a transaction in which Gould & Pollo were Cadigan's customers. If the transaction stopped there and nothing more happened, and then, later, Miss Crabtree made a trade, that would not entitle the plaintiff to a commission."

Having thus stated and illustrated this principle, the justice proceeded to state that "the question of efficient cause has nothing to do with" the case; and, after having called the attention of the jury to the conflict of evidence, to which reference has hereinbefore been made, as to whether, after the Mann lease fell through, there. was any interview between the defendant and the plaintiff in which she told him to go ahead with his attempts to procure a tenant, finally left the case to the jury in this concrete form: "If, after the Mann lease fell through, negotiations were in fact begun, with the defendant's knowledge and approval, by Mr. Cadigan, and if the negotiations went so far that they could be really said to be negotiations, and if after the naming of a customer they were suspended by the defendant and she afterward made a trade with that same customer with whom the plaintiff had talked, then you will find for the plaintiff. If you find that negotiations went on and the defendant

did not know of them, or if you find that the negotiations did not go on at all, you will find for the defendant; but if you find that they did go on with the defendant's knowledge and approval, you will find for the plaintiff."

The evidence clearly shows that, even if after the Mann lease fell through the defendant still employed the plaintiff as a broker to effect a lease, the authority was revoked on January 2. Both parties testify to this, and the plaintiff does not contend that thereafterwards he was ever given authority to act in the matter. The authority was revoked because the defendant really and in good faith had abandoned her intention to lease, and she notified the plaintiff of that fact. While the plaintiff was acting under her authority he had not effected a lease. More than two months elapsed after the revocation of the plaintiff's authority before one was effected. It is also to be noted that there was no proof of any usage or custom.

The jury therefore were allowed to find for the plaintiff under the conditions stated in the last paragraph of the charge, even if the termination of the employment of the plaintiff and of the negotiations was caused by the defendant's *bona fide* change in her intention, and also irrespective of the question whether he was the efficient cause of the lease, and in the absence of any usage or custom.

We think that the proposition as thus laid down is too broad. The relation between the defendant and the plaintiff was primarily that of principal and agent, and, as has been decided in this very case as reported in 179 Mass. 474, the defendant had the right to discharge the plaintiff at any time. When the defendant applied to the plaintiff to secure his services, she did not bind herself to give him even a reasonable time within which to procure a tenant, *Cadigan* v. *Crabtree, ubi supra;* much less did she bind herself that she would not change her mind as to the use or disposition of her property. In deciding not to lease and in discharging him for that reason, she violated no right of the plaintiff. Under the general laws of agency, his rights were fixed at the time of his discharge, provided she acted in good faith. At that time the plaintiff's efforts had been unavailing and he had not earned his commission. He did not earn it by anything he did afterwards. It is not even shown that under the

doctrine of efficient cause, as this term is understood when used in this connection, he earned a commission. His right to work for a commission, as well as his right to impose any obligation upon the defendant by reason of holding himself ready to proceed as her agent, ended upon his discharge, she acting in good faith. Such a view is sustained by the general law of agency, and, in the absence of proof of any custom or usage to the contrary, must be applicable to this form of agency. And on principle this must be so no matter what may be the stage of the negotiations, from the simple introduction of the customer to the nearly completed ending, provided always that the broker has not succeeded in securing the customer ready and willing to accede to the terms of the principal. As applicable to this case we adopt the following statement of the principle as found in *Sibbald* v. *Bethlehem Iron Co.* 83 N. Y. 378: "If, in the midst of negotiations instituted by the broker, and which were plainly and evidently approaching success, the seller should revoke the authority of the broker, with the view of concluding the bargain without his aid, and avoiding the payment of commissions about to be earned, it might well be said that the due performance of his obligation by the broker was purposely prevented by the principal. But if the latter acts in good faith; not seeking to escape the payment of commissions, but moved fairly by a view of his own interest; he has the absolute right before a bargain is made while negotiations remain unsuccessful, before commissions are earned, to revoke the broker's authority, and the latter cannot thereafter claim compensation for a sale made by the principal, even though it be to a customer with whom the broker unsuccessfully negotiated, and even though, to some extent, the seller might justly be said to have availed himself of the fruits of the broker's labor."

This case is to be distinguished from those cases in which the relation of agency has not been terminated, as well as from those where it has been terminated in bad faith. The case is also to be distinguished from those in which there is proof of a custom or usage, as in *Loud* v. *Hall,* 106 Mass. 404. On principle, then, the proposition upon which the case was submitted, as above stated, is too broad. The authorities also seem to be against it. See, as bearing upon the question, *Leonard* v.

*Eldridge,* 184 Mass. 594; *Bailey* v. *Smith,* 103 Ala. 641; *Fair-child* v. *Cunningham,* 84 Minn. 521; *Wylie* v. *Marine National Bank,* 61 N. Y. 415; *Sibbald* v. *Bethlehem Iron Co.* 83 N. Y. 378; *Alden* v. *Earle,* 24 Jones & Spen. 366; *Gillett* v. *Corum,* 5 Kans. 608; *Livezy* v. *Miller,* 61 Md. 337; *Stedman* v. *Richardson,* 100 Ky. 79; *Earp* v. *Cummins,* 54 Penn. St. 394 (cited by Gray, C. J. in *Ward* v. *Fletcher,* 124 Mass. 224); *Uphoff* v. *Ulrich,* 2 Ill. App. 399; *Abbott* v. *Hunt,* 129 N. C. 403.    See also, *contra, Gottschalk* v. *Jennings,* 1 La. Ann. 5, which seems to be in conflict with the general weight of authority.

We are of opinion that the jury should have been instructed, as requested by the defendant, that upon all the evidence the jury would not be warranted in returning a verdict for the plaintiff upon the fourth count.

*Exceptions sustained.*