[Civ. No. 7269.   Third Dist.   Dec. 2, 1946.]

JOHN J. HEFFERNAN, Respondent, v. MERRILL ESTATE COMPANY (a Corporation), Appellant.

Clarence A. Shuey, Robert W. Harrison and T. L. Chamberlain for Appellant.

Morse & Richards and Stanley C. Smallwood for Respondent.

THOMPSON, J.—The defendant has appealed from a judgment of $2,375, which was rendered in favor of plaintiff, a real estate broker, for procuring a purchaser of real property who was willing and able to buy it on the terms of the listing thereof, but who failed to sign an agreement to purchase until after the owner withdrew it from the market.

The appellant contends that the findings and judgment are contrary to law and not supported by the evidence; that the letters of correspondence between the parties do not constitute an agreement of employment because the offer of employment was not accepted by the broker; that plaintiff failed to perform his obligation so as to entitle him to commissions for the reason that an agreement in writing to purchase the land was not signed until after the defendant revoked the listing of the property and withdrew it from the market, and that the action is barred by the statute of frauds.

The defendant is a corporation which owns the real property involved in this suit, situated at Lake Tahoe in Placer County. The plaintiff is a licensed real estate broker. Both parties maintain their offices in Oakland. The complaint alleges that the defendant "listed said real property with plaintiff for sale by a written instrument dated March 7, 1944, wherein said property was listed for sale at a price of $22,500; that thereafter and on the 14th day of March, 1944, defendant by a written instrument listed said real property with plaintiff for sale at a price of $23,750 and agreed therein to pay plaintiff a commission of ten per cent (10%) of the selling price as a real estate broker's commission." The letters do not designate the duration of employment. The written instruments referred to in the complaint, upon which the plaintiff relies as fulfillment of the statute of frauds (Civ. Code, § 1624), consist of letters addressed to plaintiff and signed by the defendant. They read in part:

"March 7, 1944.

"Mr. John J. Heffernan
Brockway, California.
                    Re: Property at Tahoe, California
Dear Sir:

Please refer to our letter of June 9, 1942, in regard to sale of our property at Lake Tahoe. This is to advise that the boat, referred to therein, has been sold. The boat house on the wharf has been removed, and we are now offering the place for Twenty-Two Thousand Five Hundred ($22,500.00) Dollars. . . ."

"March 13, 1944.

"Mr. Jack Heffernan,
c/o Clyde L. Sweet,
5233 College Avenue,
Oakland, Calif.
                    Re: Property at Lake Tahoe
Dear Mr. Heffernan:

Referring to your telephone conversation, this is to inform you that the property of the Merrill Estate Company at Lake Tahoe, adjacent to Tahoe City, is now offered for sale, or rent, for the 1944 season. The property includes. . . . [Here follows description of the property in question.] . . .

The price of the entire property is Twenty-Two Thousand Five Hundred ($22,500.00) Dollars. . . ."

"Mr. Jack Heffernan,         "March 14, 1944.
c/o Clyde L. Sweet,         (In Ink: ST8280
5233 College Avenue,         June 5th)
Oakland, California

Re: Property at Lake Tahoe

Dear Mr. Heffernan:

Please refer to our letter of March 13, 1944. Since writing that, we have decided we will pay a 10% commission on the Tahoe property. When giving you a price of $22,500.00, we had in mind a commission of 5%. We are also changing our asking price to $23,750.00, which includes a 10% commission.

Will you kindly make note of this and oblige."

A previous letter was also received by plaintiff. It reads in part:

"Mr. John J. Heffernan,         "June 9, 1942.
Brockway, California.

Dear Sir:

This is to inform you for your listing that the property of the Merrill Estate Company at Lake Tahoe, adjacent to Tahoe City, is now offered for sale or rent, for the 1942 season. . . .

The present price of the property, houses, pier and boat is $33,000.00. The property, buildings and pier without boat are presently priced at $25,000.00, and the boat alone at $10,000.00. The rental for the season is $700.00 per month, excluding use of boat. Rental of boat is $300.00 per month. . . . *If interested, please communicate with us* at the above address, or by phone—Sutter 8280." (Italics added.)

Confirming a telephonic communication to plaintiff from Mr. Merrill, Jr., on May 29th, before the prospective purchaser had signed an agreement to buy the land, which message instructed plaintiff that the property was not for sale and that it was withdrawn from the market, defendant sent the following letter of withdrawal, which was erroneously dated May 30th:

"Mr. Jack Heffernan,         "May 30, 1944.
c/o Clyde L. Sweet,
5233 College Avenue,
Oakland, California.

Dear Mr. Heffernan:

We refer to our letters of March 7th and March 14th list-

ing our property at Lake Tahoe adjacent to Tahoe City. We have decided to withdraw the property from the market for the time being, so will you please be good enough to remove it from your listing? If, however, you should have any clients who would be interested at any time we would be glad to discuss the possible sale at a later date. . . ."

The proposed employment was not accepted in writing by the broker.

Findings were adopted by the trial court determining that plaintiff accepted employment by the defendant and fulfilled the contract by securing purchasers of the real property who were ready, willing and able to buy it on the terms specified in the listing offer; that the employment was not revoked prior to the execution of the written agreement of purchase, and that plaintiff is therefore entitled to his commissions amounting to the sum of $2,375. Judgment was rendered accordingly.

We are impelled to hold that the finding to the effect that the contract of employment as broker was fulfilled, is not supported by the evidence, for the reason that the employment was revoked in good faith and the land was withdrawn from the market before the regular contract to buy it was signed by the proposed purchasers. (*Gunn* v. *Bank of California,* 99 Cal. 349 [33 P. 1105]; *Williams* v. *Freeman,* 35 Cal.App.2d 104, 108 [94 P.2d 817]; *Merkeley* v. *Fisk,* 179 Cal. 748 [178 P. 945]; Civ. Code, § 2356; 12 C.J.S. 150, § 66; 8 Am.Jur. 1008, § 41; 24 A.L.R. 1538, note.) The leading case of *Gunn* v. *Bank of California, supra,* appears to be determinative of the chief issue in this case. The listing of the property for sale, in this case, specified no fixed period of time for performance. We must assume the defendant acted in good faith in revoking the offer for sale and in taking the property off of the market. It appears without conflict that was done for the reason that the Merrills desired to use it as a summer home. It was not subsequently sold by the defendant to escape payment of commissions, or at all. It is still retained and owned by the defendant. The evidence is uncontradicted that plaintiff was notified, after a previous warning to that effect, to take the property off of the market before the prospective purchasers, Mr. and Mrs. Cupps, signed a written agreement to buy it. They were never introduced to the

owners. The finding of the trial court to the contrary is therefore not supported by any evidence.

The plaintiff testified that the written agreement to purchase the land was not signed until after he was notified by the defendant that the property was not for sale and after he was instructed to take it off the market. He said in that regard that he "did not advertise the property for sale," but that Mr. and Mrs. Cupps came to his office in Oakland on May 22, 1944, to inquire regarding the terms of sale, and after being informed of the terms contained in the listing instructions, they said they would buy it "if it was as represented," but that they wanted to see the property; that he then telephoned Mr. Merrill, Jr., on May 27th, telling him he had prospective purchasers who wanted to inspect the property, and asked him to authorize the caretaker at Lake Tahoe to show them the place; that Mr. Merrill, Jr., replied that they had no objection to their viewing the property, but that before it was sold his father, Mr. Merrill, Sr., "would have to pass on the matter." That was a clear warning to the plaintiff that it might be useless for the Cupps to go to Lake Tahoe to inspect the property.

The plaintiff again testified on cross-examination, regarding the foregoing conversation, that Mr. Merrill, Jr., then said, when he was told of the prospective sale, "that was fine, . . . but if the deal was made it would be Mr. Merrill, senior [who] would have to pass on the deal." The plaintiff further testified that Mr. and Mrs. Cupps thereafter went to Lake Tahoe on Saturday, May 27th, and were furnished a key to the dwelling house by Mr. Anderson, the caretaker; that they inspected the property on both Saturday and Sunday; that the Cupps returned to his office in Oakland on Monday forenoon, May 29th, and told him they would "take the property at the price specified," and then gave him a deposit of $1,000; that he promptly telephoned Mr. Merrill, Jr., of the agreed sale and deposit, but he was then informed "he [Merrill, Jr.] would have to discuss the matter with his father"; that after about fifteen minutes had elapsed Mr. Merrill, Jr., called him on the telephone again and informed him that he had discussed the proposed sale with his father who "decided not to sell the property, and wished to remove it from the market." After that definite notice had been received the plaintiff drew a written agreement to purchase

the property on the terms of listing, which Mrs. Cupps subsequently signed in behalf of herself and her husband. The plaintiff testified in that regard: "Q. (Mr. Chamberlain) Then this instrument was actually signed after you had been notified by Mr. Merrill that the property would not be for sale? A. Yes."

Mr. and Mrs. Cupps corroborated plaintiff in many respects. There is no evidence to the contrary. Mr. Merrill, Jr., testified that plaintiff had been furnished a "listing" of the property some four years prior to May, 1944; that plaintiff had never furnished the defendant with any prospective purchaser before the week beginning May 22, 1944; that the first time plaintiff called his attention to the prospect of selling the property to Mr. and Mrs. Cupps, Mr. Merrill, Jr., told him that if a sale could be made it would have to be subject to his father's approval; that he did tell plaintiff, about May 27th, he would authorize the caretaker to permit them to look at the property, but then notified plaintiff that if they desired to buy it, his father "would have to pass on the matter"; that when plaintiff informed him on Monday, May 29th, that the Cupps would purchase the property on the terms mentioned in the previous listing, he again told him it would not be sold except with his father's consent; that he immediately consulted with his father and they decided not to sell the property for the reason that his father had been using it as a summer home and expected to continue to do so; that within fifteen minutes after the telephone call from plaintiff, Mr. Merrill, Jr., called him again and definitely told him the property was not for sale, and requested him to take it off of the market. There is nothing in the record to show that the Merrills were not in good faith in refusing to sell the property and in revoking plaintiff's former employment as a broker, if he was so validly employed. The defendant did not subsequently sell the property. So far as the record discloses, the Merrills still own and use the place as a summer home. The Merrills never saw or discussed the sale with the Cupps. After failing to secure the defendant's Tahoe property, Mr. and Mrs. Cupps purchased from another owner the Pomin Resort at Lake Tahoe for $85,000.

According to the great weight of authority, an owner of real property who has not contracted to employ a broker for any specified period of time may revoke the employment

and terminate the agency at any time before it is consummated. (8 Am.Jur. 1008, § 41.) Section 2356 of the Civil Code provides in part:

"Unless the power of an agent is coupled with an interest in the subject of the agency, it is terminated by: (1) Its revocation by the principal; (2) his death; or, (3) his incapacity to contract. . . ."

The plaintiff in this case admitted that he had personal notice of the revocation of his alleged agency, and a request to take the property off of the market, before the written agreement of the prospective purchasers was executed. The transaction was never consummated. The terms of plaintiff's employment were not fulfilled before the revocation of his agency.

The correspondence in the present case amounted to no more than an unilateral offer to sell on the part of the owner, which did not grant a specified time for performance by the broker. The authorities hold, under such circumstances, that the owner may revoke in good faith his offer at any time before complete performance of the broker by procuring a binding sale to one who is willing and able to purchase the property on the terms specified; and by securing the purchaser's written agreement to that effect. (*Brown* v. *Pforr*, 38 Cal. 550; *Roth* v. *Moeller*, 185 Cal. 415 [197 P. 62]; *Cadigan* v. *Crabtree*, 179 Mass. 474 [61 N.E. 37, 88 Am.St. Rep. 397, 55 L.R.A. 77]; *Cadigan* v. *Crabtree*, 186 Mass. 7 [70 N.E. 1033, 104 Am.St.Rep. 543, 66 L.R.A. 982]; *Sibbald* v. *Bethlehem Iron Co.*, 83 N.Y. 378 [38 Am.Rep. 441]; 24 A.L.R. 1538, note.)

In the Gunn case, *supra,* judgment for the plaintiff, broker, was reversed for lack of performance in failing to procure a written agreement from the proposed purchaser to buy the land, or to present him to the owner so that it could procure a binding contract therefor, before the offer to sell was rescinded by the owner. The Supreme Court said, at page 354:

"The right of plaintiff to the agreed compensation depends upon the performance of his contract to procure a purchaser, and as he did not do this, and defendant neither waived nor prevented such performance, he has not earned his commission."

With relation to the broker's failure to fully perform, the court said, at page 351 of that decision:

"It is conceded that Keating was financially able to pay the price he orally agreed to pay for the land, but he signed no contract which bound him to complete the purchase, . . . and plaintiff did not introduce him to Brown, or inform him who was the purchaser referred to in the above letter. . . . The contract of the broker is to negotiate a sale; that is, to procure a valid contract to purchase, which can be enforced by the vendor if his title is perfect; or if he does not procure such contract, to bring the vendor and the proposed purchaser together, that the vendor may secure such a contract."

In *Auerbach* v. *International W. L. A. Gesellschaft*, 177 Fed. 458, 462, the right of an owner of property to revoke the unilateral contract of employment of a broker, in which there is no specified time of performance expressed, is upheld in the following pertinent language:

"It is a vexed question whether an agency of this sort, which is fixed in time, may or may not be repudiated by the principal in the absence of an express promise by the agent to perform any services. It is, of course, obvious that, in the absence of some implied promise at the inception of the contract, it is only a unilateral promise and the principal may withdraw his offer, whenever he pleases; and it is well settled that, where the contract is not for a fixed time, he may do so (citing authorities). . . . It is an error to suppose that the subsequent part performance of the conditions of a unilateral promise create an obligation. Either it is given at the outset for a counterpromise or it is given for the performance of the acts specified. Although the results are often unjust, they should not pervert the rectitude of such fundamental principles of law as those controlling the creation of contract obligations."

In 2 Mechem on Agency, second edition, page 2046, section 2449, it is said:

"Where there has been no contract between the principal and the broker that the latter shall have some particular time within which to find a purchaser, it is, as a general rule, entirely competent for the principal to revoke the authority without liability at any time before it is performed. If it be regarded as a mere employment at will, it could be so terminated. If the transaction be regarded as an offer to the broker to pay him if he will perform a certain act, namely, find a purchaser, the offer may be withdrawn by the principal without liability at any time before its acceptance by the

performance of the act. The only thing which would prevent revocation or withdrawal would be performance. It would make no difference that much time had been spent or that the performance was great; unless the act could be regarded as at least practically performed, the principal might revoke without liability. What would be regarded as the finding or producing of a purchaser so as to constitute performance has already been considered.''

█ Where the time for performance is definitely fixed by the contract, the transaction must be completed within that designated time to entitle the broker to his commissions. In 2 Mechem on Agency, page 2026, section 2439, it is said in that regard:

''It is also indispensable that the purchaser should be found within the time limited, for if the broker's exertions do not produce the buyer until after that time has expired, it is not enough, even though that buyer may subsequently become the purchaser, unless the principal has caused the delay, or unless he waives it.''

Regarding the question as to what constitutes performance on the part of a broker so as to entitle him to his commissions, in the absence of more specific conditions expressed in the contract, the last cited authority says in volume 2, page 2003, section 2431:

'' (1) If the broker has obtained from a proper person and delivered to his principal a written *contract* to purchase, or —since he may not be authorized to sign a written contract— a written *offer* to purchase which the principal can immediately turn into a written contract by accepting it, he would ordinarily be deemed to have performed his undertaking. (2) When the broker has brought forward, or designated and put the principal into communication with, a suitable person to whom the principal may sell in the ordinary course of business, he has, by the weight of authority, performed his undertaking, even if, through no fault of the broker's the buyer is not accepted.''

█ In the present case the broker did not obtain a written, enforceable contract to buy the land until after he had been informed by the owner that the land was not for sale. There is no evidence of bad faith on the part of the owner in revoking the broker's employment and taking the property off of the market. The broker never did bring his customers

face to face with the defendant so that a binding contract could be procured.

The California authorities hold, under such circumstances, that the broker failed to fully perform his undertaking in the unilateral contract of employment, and that he is therefore not entitled to his commissions.

In the cases, including *Houston* v. *Williams*, 53 Cal.App. 267 [200 P. 55], and *Blumenthal* v. *Goodall*, 89 Cal. 251 [26 P. 906], relied upon by the respondent, on the question of performance which may entitle a broker to his commissions, the contracts of employment invariably granted the brokers specified periods of time within which to perform. In the Blumenthal case the contract of employment of the broker provided that ''This contract to be in force for ten days from date hereof.'' Quoting with approval from section 209 of Mechem on Agency, the court said:

'' 'It [the right to revoke] is entirely consistent with the existence of the power that the principal may agree that for a definite period he will not exercise it, and for the violation of such an agreement the principal is as much liable as for the breach of any other contract.' ''

The court concluded that the broker, having procured a purchaser within three days of the execution of the contract, and prior to its revocation, ''had placed the matter in the position that success was practically certain and immediate, and it would be the height of injustice to permit the principal *then* to withdraw the authority and terminate the agency *as against an express provision of the contract.*'' (Italics added.)

In the Houston case, *supra,* judgment for the plaintiff broker was affirmed. The contract of employment gave the broker ninety days within which to procure a purchaser. He procured a purchaser on the terms specified in two months and seventeen days thereafter. The appellant, however, had sold the property to another party, and refused to pay the commissions. The court held that since the contract specifically gave the broker ninety days to procure a purchaser, and he knew the broker had a prospective purchaser who was likely to buy the land, the owner could not revoke the agency within that period and escape liability for the agreed commissions. The court said in that regard:

''By selling to another within the prescribed period he [the owner] necessarily violated this provision of the contract

and was liable for the commission since the agent performed his agreement.''

The other cases relied upon by respondent are similarly distinguishable from the present case.

There is another exception to the previously announced rule that, in the absence of language in the contract granting a specified time within which to perform, the owner may revoke his agency at will. That exception is that the revocation must be made in good faith. The owner may not take advantage of the broker's services in procuring a prospective purchaser, and then revoke his agency so as to personally consummate the sale, or for the mere purpose of escaping payment of the agreed commissions.

But the defendant in this case was guilty of no such bad faith or conduct. The agency was revoked, after fair warning, because Mr. Merrill, Sr., desired to continue to use it, as he had in the past, for his summer home. The defendant did not sell the property to any other purchaser. We must assume the Merrills still own and use the Tahoe property. The revocation of employment of the broker was in good faith.

For the foregoing reasons the judgment is reversed and the trial court is directed to render judgment for the defendant.

Adams, P. J., and Peek, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied January 30, 1947.