[Civ. No. 16006.   First Dist., Div. Two.   Nov. 18, 1954.]

BYRON W. SUMMERS, Respondent, v. A. C. FREEMAN, Appellant.

Wagstaffe & Daba for Appellant.

Charles McLaughlin, Alfred J. Harwood and Wayne R. Millington for Respondent.

DOOLING, J.—This is an appeal from a judgment for $6,250 following a jury verdict in favor of plaintiff, whose recovery was based upon a written agreement of employment between him as a real estate broker and the defendant.

On January 22, 1951, defendant-appellant Freeman approached plaintiff-respondent Summers. The appellant owned a piece of commercial property in South San Francisco and was interested in exchanging it for commercial property in San Francisco.

Respondent contacted owners of property in San Francisco including Maurice Stulsaft who owned the Land Development Company. Stulsaft gave respondent 12 statements of buildings he owned and the respondent gave appellant copies of three of them.

Respondent looked over the three buildings first and went to the San Francisco Real Estate Board to make an onion-skin map of the block in which the three buildings were located. From this map respondent made two copies on cardboard, one of which he gave to appellant.

Armed with the maps and the breakdowns on the buildings, which included cost, type of construction, number of square feet etc., respondent met appellant in front of one of the buildings being considered and the one ultimately obtained by appellant (hereinafter called 249 Pine Street).

They went through the three buildings from top to bottom, at the end of which appellant told respondent to go see Stulsaft in order to get the price and come to some kind of terms.

Respondent suggested to Stulsaft that appellant make an offer of $150,000 cash and the South San Francisco property for 249 Pine Street. Stulsaft replied that if respondent could get appellant to sign an exchange agreement Stulsaft would make a counteroffer.

After the interview with Stulsaft respondent told appellant that Stulsaft would agree to exchange 249 Pine Street for the South San Francisco property but wanted appellant to make the first offer. In answer to this appellant stated that

he wished to see other buildings so that he could make a comparison.

Between January 30 and July 24, appellant and respondent had many conversations about the exchange of the South San Francisco property for 249 Pine Street, and although respondent showed him about 14 other buildings he still felt 249 Pine Street was the best deal.

After a while appellant told respondent to concentrate on the exchange of his property for the Broadway Market in Redwood City which was also owned by Stulsaft.

On July 24, 1951, the contract upon which this action is based was signed by appellant. The contract reads: "7-24-51. I, the undersigned, agree to sell this property outlined in red, 8.8 acres, more or less, through agency of Byron W. Summers. (Signed) A. C. Freeman." It was written by respondent on the back of one of the maps of appellant's property. Respondent testified that appellant signed an agreement earlier at the same meeting giving him authority to exchange appellant's property for the Broadway Market, but he also wanted to protect himself in case any of the other deals on which he had been working went through.

Subsequent to this meeting the two parties had three separate meetings on August 13, 16 and 27, at which times they discussed the different possibilities of exchange and on each occasion respondent emphasized that 249 Pine Street was the best deal.

With appellant's consent respondent also advertised the South San Francisco property at his own expense in the Wall Street Journal during the month of August.

In late July or early August appellant again went through 249 Pine Street very thoroughly, this time accompanied by another real estate agent named Phillips with whom he had done business in early 1951 and a man named Shorenstein who represented Stalsaft. As a consequence the exchange agreement was written and signed near the end of August by all parties, and Phillips received a $5,000 commission from appellant.

Appellant makes three contentions: (1) The agreement sued upon was an exclusive agreement and therefore void because it did not contain a definite termination date; (2) it was error for the court to instruct the jury to disregard any testimony that a copy of the alleged agreement sued upon was either delivered or not delivered to appellant; (3) the facts were insufficient as a matter of law, to prove that re-

spondent was the procuring cause of the exchange of appellant's land.

The first contention is based on Business and Professions Code, section 10176, subdivision (f). The pertinent part of the section reads:

"The commissioner may, upon his own motion, and shall upon the verified complaint in writing of any person, investigate the actions of any person engaged in the business or acting in the capacity of a real estate licensee within this State, and he may temporarily suspend or permanently revoke a real estate license at any time where the licensee within the immediately preceding three years, while a real estate licensee, in performing or attempting to perform any of the acts within the scope of this chapter has been guilty of any of the following: . . .

"(f) The practice of claiming, demanding, or receiving a fee, compensation or commission under any exclusive agreement authorizing or employing a licensee to sell, buy or exchange real estate for compensation or commission where such agreement does not contain a definite, specified date of final and complete termination."

In *Dale* v. *Palmer*, 106 Cal.App.2d 663, 667 [235 P.2d 650], it was held that a violation of section 10176, subdivision (f), operates to make the contract founded on such act void. The reason given is that where a statute imposes a penalty for the doing of an act a contract based upon such act is void.

The fundamental question therefore is whether this is an exclusive agency contract so that it falls within the scope of the section.

The general rule on exclusive agency agreements is stated as follows: "A real estate broker's authority to sell real property is not exclusive, unless it is made so, by the contract of employment, in unequivocal terms or by necessary implication." (12 C.J.S., Brokers, § 20, p. 63.) The pertinent language of the contract reads: "I agree . . . to sell this property . . . through agency of Byron W. Summers."

Appellant cites no case in which an agreement in comparable language has been construed as creating an exclusive agency. He would have the agreement construed as if it read: "I agree . . . to sell this property *exclusively* through agency of Byron W. Summers." To so construe it is to disregard the rule that "a contract must receive such an interpretation as will make it lawful, . . . if it can be done without violating the intention of the parties" (Civ. Code, § 1643;

*Barham* v. *Barham,* 33 Cal.2d 416, 429 [202 P.2d 289]; 12 Cal.Jur.2d, Contracts, § 127, p. 340) and by interpolation of the word "exclusively" to make a contract unlawful which without such interpolation is reasonably susceptible of an interpretation which makes it lawful.

Section 10142 Business and Professions Code provided at the date of the execution of this contract:

"When a licensee prepares or has prepared an agreement authorizing or employing such licensee to purchase or sell real estate for compensation or commission, such licensee shall deliver a copy of such agreement to the person signing same."

The testimony was in conflict as to whether a copy of the agreement was delivered to appellant. The court instructed the jury not to consider this evidence in arriving at its verdict.

▉ The failure to deliver a copy of the agreement is collateral to the agreement itself and we are satisfied that it does not affect its validity. It was so held in *Schurz* v. *Gelber,* 117 Cal.App.2d 681, the court saying at page 684 [256 P.2d 634]: "It may be noted that the statute does not require delivery of a copy 'forthwith,' *nor does it provide that the agreement shall be invalid if the broker fails to deliver such copy.*" (Emphasis ours.)

▉ Thereafter the Legislature amended the section (Stats. 1953, pp. 2215-2216) by adding the words "at the time the signature is obtained." This was apparently done to meet the construction placed on the section in the Gelber case, *supra,* that it did not require delivery of a copy "forthwith," but in the face of the court's other statement in that case that the statute does not "provide that the agreement shall be invalid if the broker fails to deliver such copy" the Legislature made no change in the section in that respect. This must be taken as a legislative acquiesence in that judicial construction of the section. (*Holmes* v. *McColgan,* 17 Cal.2d 426, 430 [110 P.2d 428]; *Hunt* v *Superior Court,* 93 Cal.App.2d 504, 507 [209 P.2d 411]; *Armstrong* v. *Armstrong,* 85 Cal.App.2d 482, 485 [193 P.2d 495].)

▉ Appellant claims finally that respondent did not bring to appellant a willing purchaser on terms agreed and therefore did not legally earn his commission. (9 Cal.Jur.2d, Brokers, § 80, pp. 242-244.) But here no certain terms were fixed for the exchange and the applicable rule is that stated in section 87 of the same article (9 Cal.Jur.2d, p. 255): "Where a broker's employment agreement does not contemplate that he shall procure a customer on certain terms, he

is not obliged to bring the minds of the principal and the customer to an agreement. He earns his commission when he procures a customer on terms to be arranged with the principal.'' The facts of this case bring it well within this rule.

Judgment affirmed.

Nourse, P. J., and Kaufman, J., concurred.