[Civ. No. 23639. Second Dist., Div. Two. May 21, 1959.]

P. D. TETRICK, Appellant, v. A. E. SLOAN, Respondent.

Jerome J. Mayo and Harriet Pugh for Appellant.

Hightower, Gregg & Garland and David M. Garland for Respondent.

FOX, P. J.—Judgment was entered for defendant at the conclusion of a nonjury trial in which plaintiff sought to recover for real estate brokerage services.

Defendant owns certain real property in Ventura County, known as the Bar "S" Ranch. On March 17, 1955, the following writing was signed by the defendant:

"I Authorize P. D. Tetrick to negotiate a new lease with a Major Oil Company on my property, located in Ventura County, California, known as Bar 'S' Ranch, consisting of 2275 acres more or less. Oceanic Oil Company has now under lease the deep rights and if Oceanic *Oll* Company does not comply with its present agreement in full, then it is my desire that P. D. Tetrick is to proceed in negotiating a new deal. I am to retain 1/6 or 16⅔ land owners royalty also I am to receive ½ of any bonus paid in the consummating of this deal."

Pursuant to this authorization, plaintiff contacted various oil companies, including The Texas Company. The trial court specifically found "That it is true that plaintiff discussed with major oil companies with regard to an oil lease on the defendant's 'Bar S Ranch' property, and it is true that plaintiff contacted The Texas Company with regard to an oil and gas lease . . . prior to March 19, 1956. . . ." Defendant, by an instrument in writing, on March 19, 1956, canceled the authorization granted in March, 1955. Subsequently, on July 6, 1956, defendant signed an oil lease with The Texas Company, and received a bonus in excess of $39,000. Plaintiff thereafter commenced an action to recover one half of this bonus. Judgment was for defendant and plaintiff prosecutes this appeal therefrom.

Plaintiff's version of his activities as disclosed by his opening brief with respect to the granting of the lease to The Texas Company is as follows:

"Plaintiff . . . first contacted The Texas Company by con-

tact with Mr. Shaefer, then Mr. Brandt, Mr. Baker, Mr. Hubble in Santa Paula, and finally, Mr. Shuey. The contact with Mr. Hubble was by telephone on or about October 7, 1955. Thereafter, he [plaintiff] went to Mr. Shuey's office around January 20, 1956. On this occasion, defendant was present and Shuey told defendant that The Texas Company was interested in his property at $60.00 an acre. Defendant used the prior offer which plaintiff had arranged from the Superior Oil Company as a lever to get a deal from The Texas Company and he lied to Mr. Shuey and told him that he had an offer from Superior Oil Company of $100 an acre. At that time The Texas Company was willing to offer $60 an acre and defendant wanted $100 an acre. On that occasion, the only thing they talked about was the initial amount per acre. (It is to be noted that this was following the pattern theretofore set by defendant, in that on the Union Oil contract [sic] and the Superior Oil contract [sic] nothing was discussed other than the initial payment, and that when that was not proven satisfactory, defendant refused to do anything more in the premises.) During this conversation with Mr. Shuey, the 3 per cent overriding royalty was discussed. Thereafter, at defendant's request, he [plaintiff] again contacted Mr. Hubble. Plaintiff stated that with regard to The Texas Company, as with regard to all other oil companies, he interviewed or talked with the Land Agent, and in each case told them that he was interested in leasing the Bar 'S' Ranch. . . ."

In his opening brief, plaintiff summarizes Shuey's testimony as follows:

"Mr. Shuey was called by the defendant and stated that he was Assistant Divisional Land Man for the Producing Department of the Pacific Coast Division of The Texas Company, located in Los Angeles. Mr. Shuey stated that the first time he talked with defendant, he did not talk about the entire Bar 'S' Ranch but a portion of it. He stated that The Texas Company has a system whereby prospective oil lands are processed through the company and then finally there is an authorization for The Texas Company to lease. He stated that, of course, the lands are first given to the Geological Department, and finally an authorization is made.

"Mr. Shuey stated that the Oceanic Oil Company lease mentioned in the agreement of March 17, 1955, was quitclaimed in October of 1955 and that he would not negotiate on any of the Bar 'S' Ranch property until it had been quitclaimed.

"Mr. Shuey stated that the first authorization from man-

agement . . . to enter into a lease on 673 acres of the Bar 'S' Ranch was had in June of 1956. He said that he recalled a conversation with plaintiff, but could not place the time, except that it was in early 1956, between January and June.

"Mr. Shuey's then version of the meeting with plaintiff was that plaintiff told him he was representing defendant and asked him if he was interested in a lease, and that Shuey cut him off short, telling him he would have to have written authorization. He maintained he had not seen or talked to plaintiff in 1955. Mr. Shuey, however, was not so positive later."

The defendant's version of plaintiff's activity with respect to The Texas Company lease is that plaintiff had nothing to do with this lease and, he, defendant, negotiated and entered into the lease on the 6th of July, 1956. There is no showing that defendant did not act in good faith.

As grounds for reversal, plaintiff argues that the writing signed by defendant on March 17, 1955, constituted an offer for a unilateral contract and, once partly performed by plaintiff, defendant had no legal right to cancel such offer; and, having done so, plaintiff may recover on the contract as if he had fully performed. Plaintiff also contends that he is entitled to recover under the doctrine of promissory estoppel.

Essentially, this appeal involves two questions. First, did plaintiff sufficiently perform prior to March 19, 1956, so that he was entitled to his commission before his authority was revoked? Second, was defendant free to revoke plaintiff's authority without liability after plaintiff had expended time and effort pursuant to the March 17, 1955, authorization?

It is plaintiff's position that his duties did not include the actual give-and-take phases of working out the terms and conditions of a lease with a potential lessee but that he was merely to aid the defendant in this regard; also, plaintiff argues that "the word 'negotiate' . . . does not mean consummate, but means to treat with a view to coming to terms on some matter . . . to conduct communications or conferences as a basis of agreement. . . ." The trial court was of the opinion that this phase of the authorization was uncertain and on that basis received parol evidence as to the meaning of "negotiate." The defendant testified that plaintiff was "to do everything except" sign for him. The trial court found against plaintiff on this issue and such finding is supported by substantial evidence.

Before a broker or salesman is entitled to a commission for the sale or lease of real property, he must find a party who

is ready, willing, and able to purchase or lease on the terms and conditions specified in the contract of employment, or, if the precise terms are not specified, upon terms satisfactory and acceptable to his principal. (*Collins* v. *Vickter Manor, Inc.*, 47 Cal.2d 875, 880 [306 P.2d 783] ; *Lawrence Block Co.* v. *Palston*, 123 Cal.App.2d 300, 305-306 [266 P.2d 856] ; *Diamond* v. *Fay*, 23 Cal.App. 566, 568 [138 P. 933].) This may be accomplished, *inter alia*, by securing a written contract or offer signed by the potential purchaser or lessee. ▇ In *Gunn* v. *Bank of California*, 99 Cal. 349 [33 P. 1105], the court pointed out (p. 353) that: "[t]he contract of the broker is to negotiate a sale; that is, to procure a valid contract to purchase, which can be enforced by the vendor if his title is perfect; or if he does not procure such contract, to bring the vendor and the proposed purchaser together, that the vendor may secure such a contract. . . ." (See also 2 Mechem on Agency 2d ed., p. 2003, § 2431.) ▇ However, merely introducing the principal to a party who comes to an agreement with him after the termination of the agency but who was not ready, willing and able to consummate the transaction during the life of the agency is in itself insufficient to entitle the broker to a commission. (See *Brown* v. *Mason*, 155 Cal. 155, 158-159 [99 P. 867, 21 L.R.A. N.S. 328] ; *Lawrence Block Co.* v. *Palston, supra,* at pp. 307-308; *Nelson* v. *Mayer*, 122 Cal. App.2d 438, 445-446 [265 P.2d 52].)

▇ In the instant case, plaintiff did not secure a written lease or offer to lease from The Texas Company, nor did he introduce the defendant to anyone willing to enter into a lease on terms and conditions acceptable to the defendant. The evidence is clear that when the plaintiff and defendant met with Shuey, the defendant wanted $100 an acre bonus for his property but Shuey was willing to pay only $60 per acre. Furthermore, there was no agreement as to the amount of land to be leased. Under such circumstances, and based upon the authority to which reference has been made, it is clear that as of March 19, 1956, plaintiff had not performed and was not therefore entitled to any commission.

Where, as in the instant case, there is no contract between the principal and the real estate broker or salesman "that the latter shall have some particular time within which to find a purchaser [or lessee], it is, as a general rule, entirely competent for the principal to revoke the authority without liability at any time before it is performed. . . . The only thing which would prevent revocation or withdrawal would be perform-

ance. It would make no difference that much time had been spent or that the performance was great; unless the act could be regarded as at least practically performed, the principal might revoke without liability.'' (2 Mechem on Agency, 2d ed., p. 2046, § 2449.) ▮ In *Heffernan* v. *Merrill Estate Co.*, 77 Cal.App.2d 106, 112-113 [174 P.2d 710], the court states the applicable rule as follows: ''According to the great weight of authority, an owner of real property who has not contracted to employ a broker for any specified period of time may revoke the employment and terminate the agency at any time before it is consummated.'' The court then stated (p. 113) that ''[t]he correspondence in the present case amounted to no more than an unilateral offer to sell on the part of the owner, which did not grant a specified time for performance by the broker. The authorities hold, under such circumstances, that the owner may revoke in good faith his offer at any time before complete performance of his broker by procuring a binding sale to one who is willing and able to purchase the property on the terms specified, and by securing the purchaser's written agreement to that effect.'' As previously discussed, plaintiff had not performed prior to the time he received defendant's written withdrawal of authorization. Plaintiff contends, however, that once he has commenced performance, the defendant could no longer revoke without incurring liability, citing *Los Angeles Traction Co.* v. *Wilshire*, 135 Cal. 654 [67 P. 1086]. (See generally also, Rest., Contracts, § 45; 1 Williston, Contracts, § 60A (1936 ed.).) Plaintiff also argues that the doctrine of promissory estoppel is applicable (see generally, *Drennan* v. *Star Paving Co.*, 51 Cal.2d 409 [333 P.2d 757]; Rest., Contracts, § 90). The plaintiff's argument misconceives the nature of his relationship with the defendant. ▮ Generally, there are three types of brokerage listings. First, the general listing. Such is revocable at the will of the owner in good faith at any time before performance, regardless of the efforts expended by the broker. Such a listing leaves the owner free to list his property with other brokers, to sell it himself, or to withdraw it from the market. Second, the exclusive agency. Terms are inserted in the listing which provide that for a stated period the owner will not deal through other brokers, yet he may sell the property himself without liability. Third, the exclusive right to sell. This type of agency even precludes the owner himself from selling the property during the stated term without paying the brokerage commission. ▮ All three varieties are basically

offers for a unilateral contract and, by generally accepted principles of contract law, are revocable until accepted by performance of the requested acts. However, where the listing contains language to the effect that the broker shall have, for a stated period, an exclusive right to deal with or sell the property, the offer becomes irrevocable for the prescribed period. It is in those situations where the listing contains these added stipulations that we find the courts speaking of the irrevocability of the offer as a consequence of the expenditure of time and money by the broker in attempting to sell the property. After noting the three different types of listings referred to above, the court in *Baumgartner* v. *Meek,* 126 Cal. App.2d 505, 509 [272 P.2d 552], states: "In view of the nature of the basic transaction between the owner and the broker, that is, a listing which is no more than an offer of a unilateral contract to be accepted only by a performance of the requested act, the additional stipulations were challenged in many courts as not resulting in any contract in fact between the parties (citations). But in many states, and in this state, courts have accepted such written listings as resulting in contractual relations. Though the basic offer to pay a commission for the procuring of a purchaser ready, able and willing to buy can still be accepted only by performance, nevertheless it has been held that these restrictive stipulations bind the owner and subject him to liability if he refuses to abide by them. These holdings are sometimes based on the idea that the restrictive clauses constitute subsidiary promises resting upon the consideration that the broker agrees to and does expend time and effort to bring about a sale." After quoting from the Restatement of Contracts, section 45, the court continues: "It is unnecessary to attempt to follow the reasoning given in the many opinions of courts dealing with this subject. We think that in California the rule has been too long declared and too often enforced to leave the matter open." (See *Kimmell* v. *Skelly,* 130 Cal. 555 [62 P. 1067].)

The authorization in the instant case was analogous to a general listing. It gave plaintiff no designated time in which to procure a lessee and manifestly did not give plaintiff an exclusive agency or exclusive right to lease. The authorization is completely silent in this respect. In *Summers* v. *Freeman,* 128 Cal.App.2d 828, 831 [276 P.2d 131], the court said that "[t]he general rule on exclusive agency agreements is stated as follows: 'A real estate broker's authority to sell real property is not exclusive, unless it is made so, by

the contract of employment, in unequivocal terms or by necessary implication.' (Citation.)'' Had the parties contemplated such a relationship they surely would have so stated in the writing. A general listing, as noted, is revocable at any time prior to performance without liability. To apply the rule from the Wilshire case (see Rest., Contracts, § 45), *supra,* or the promissory estoppel doctrine to the facts of the instant case, would be to transform that which is equivalent to a general listing into an exclusive listing. This we cannot do. Therefore, as plaintiff did not perform the requested act prior to the revocation of the offer, and as defendant was free to revoke without incurring liability, the plaintiff has no right to redress in this action.

The judgment is affirmed.

Ashburn, J., and Herndon, J., concurred.

A petition for a rehearing was denied June 18, 1959, and appellant's petition for a hearing by the Supreme Court was denied July 15, 1959.